277 P.3d 1027

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Steve C. CABAGBAG, Jr., Petitioner/Defendant–Appellant.**

**No. SCWC–30682.**

Supreme Court of Hawai'i.

May 17, 2012.

John M. Tonaki, public defender, (James S. Tabe, deputy public defender on the briefs), for petitioner.

Stephen K. Tsushima, deputy prosecuting attorney, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, DUFFY, and McKENNA, JJ.

### OPINIONS OF THE COURT

Petitioner/Defendant–Appellant Steve C. Cabagbag, Jr. (Petitioner) filed an application for writ of certiorari (Application) on October 11, 2011 in this court, seeking review of the July 13, 2011 judgment of the Intermediate Court of Appeals (ICA), filed pursuant to its June 27, 2011 Summary Disposition Order,[1] *State v. Cabagbag*, No. 30682, 2011 WL 2547987 (App. June 27, 2011) (SDO),

1. The Summary Disposition Order was filed by Presiding Judge Daniel R. Foley and Associate Judges Lawrence M. Reifurth and Lisa M. Ginoza.

2. The Honorable Karen S.S. Ahn presided.

3. As set forth in Part III, the dissent would hold that the instruction should be given *sua sponte*, i.e., even if not requested by the defendant.

4. HRS § 708–836 provides in relevant part:

§ 708–836. **Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly

affirming the Judgment of Conviction and Probation Sentence filed by the circuit court of the first circuit (the court).[2]

### PART I: EYEWITNESS IDENTI- FICATION JURY INSTRUC- TION REQUIREMENT

(By: ACOBA, J., with whom all justices concur)

It is concluded unanimously that (1) in criminal cases, the circuit courts must give the jury a specific eyewitness identification instruction whenever identification evidence is a central issue in the case, and it is requested by the defendant,[3] (2) a circuit court may, in the exercise of its discretion, give the instruction if it believes the instruction is otherwise warranted in a particular case; and (3) the instruction set forth in this opinion is adopted as a model charge.

#### A.

Petitioner allegedly stole a truck from a storage facility on February 3, 2010, as well as several tools from a construction site on February 18, 2010. On February 22, 2010, Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) charged Petitioner by felony information with two counts: (1) Unauthorized Control of a Propelled Vehicle, HRS § 708–836 (Supp.2010)[4]; and (2) Theft in the Second Degree, HRS § 708–831 (Supp. 2010)[5]. The court held a two-day jury trial that began on May 18, 2010.

#### 1.

In its opening statement, Respondent stated, in relevant part, that the evidence would

exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

(2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

5. HRS § 708–831 provides in relevant part:

§ 708–831. **Theft in the second degree.** (1) A person commits the offense of theft in the second degree if the person commits theft:

(a) Of property from the person of another;

(b) Of property or services the value of which exceeds $300[.]

show that Honolulu Police Department (HPD) Officer Eutiquito Tomimbang (Officer Tomimbang) identified Petitioner as the man he saw driving a stolen truck that was discovered with stolen tools. The defense maintained that Officer Tomimbang's identification was unreliable, and claimed that Officer Tomimbang would only testify that "he s[aw] a male in there, a local male, short dark hair. That's the description. That's what he sees. It's dark, clearly at 1:07 in the morning."

### 2.

During trial, the jury heard the pertinent evidence that follows. Leak Master Roofing and Waterproofing ("Leak Master") owned a white Ford truck with the license plate number 221–TRD. Around 3:30 p.m. on January 29, 2010, Matthew Kotar (Kotar), Leak Master's general manager, parked the truck for the weekend in the company's storage "cave" at Waikele Self–Storage ("Waikele") in Honolulu.[6] Kotar and his foreman were the only persons who had access to the truck's keys, and only Kotar was authorized to drive the vehicle.

On February 3, 2010, Kotar received a phone call from Waikele. Kotar was told that the truck ran through the front entrance of the facility. Normally, Waikele requires all persons driving vehicles out of the facility to stop and provide identification. When Waikele's security guards asked the person driving Leak Master's truck to stop, the driver sped off.

After receiving the phone call, Kotar went to Waikele to verify that his truck was no longer in its "cave." Kotar determined that the truck was missing. After contacting all of Leak Master's employees to ensure that none had taken the truck without his knowledge, Kotar filed a police report stating that the truck had been stolen. Kotar heard nothing from the police regarding the truck until February 18, 2010.

Around 1:00 a.m. on February 18, 2010, Officer Tomimbang was on patrol in the Pearl City Highlands area. At 1:12 a.m. he learned that a caller had reported that the "cattle gate" (gate) at Newtown Recreation Center (recreation center), which is usually kept closed, was open. Another officer, Officer Enrico Domingo (Officer Domingo), was the first to arrive at the scene. Officer Tomimbang arrived shortly after. He noticed that the gate was completely open and that there was only one lock on the padlock even though the gate is usually secured with two locks.

Having verified that the recreation center, which is located approximately 50 yards from the gate, was secured, Officer Tomimbang and Officer Domingo proceeded to the construction area, approximately 20 yards from the gate. At the time, the construction area was occupied by the Frank Coluccio Construction Company (Frank Coluccio Construction). Officer Tomimbang noticed that two of the containers used to store equipment in the construction area were open. Officer Tomimbang asked dispatch to contact a representative from the company to let them know that there was a possible break-in.

Around 1:40 a.m., Officer Tomimbang was standing near the office trailer at the construction site when he heard the sound of a large truck coming up Ka'ahele Street, which is adjacent to the gate. Officer Tomimbang assumed the truck had been sent by Frank Coluccio Construction, so he walked toward the fence near Ka'ahele Street. From his location near the fence, Officer Tomimbang could observe Ka'ahele Street. A street light lamp was located on the side of the street where Officer Tomimbang was standing. Another street lamp was located on the opposite side of the street.

Officer Tomimbang saw the truck driving slowly up Ka'ahele Street. He testified that, although his flashlight was off, he got a good look at the truck driver's face because the street was well-lit and the driver stuck his face out the window and looked in the officer's direction. Officer Tomimbang watched as the truck continued to drive up Ka'ahele Street and turned right on Lulu Street. The

---

6. The storage units are referred to as "caves" because they used to be military caves that were converted into storage facilities.

truck then stopped and parked on Lulu Street, approximately 30 feet from Kaʻahele Street. During trial, Respondent introduced several photographs that purportedly depicted the way Kaʻahele Street would have appeared to Officer Tomimbang on February 18, 2010. Defense counsel objected on the ground that the photos were misleading because they were taken with a camera that had its flash setting "on," and therefore may have depicted more light than was available to Officer Tomimbang on the night in question. The court admitted the photographs.

When Officer Tomimbang saw the truck continue on to Lulu Street, he walked toward a location behind the fence from which he could get a better view of the truck. Standing just behind the fence, about 60 to 70 yards from where the truck was parked, Officer Tomimbang saw a man exit the truck's driver's side door and head toward the construction site. The man approached the gate, closed it, and continued walking toward Officer Tomimbang. Once the man was within 20 feet, Officer Tomimbang shone his flashlight toward the man. According to Officer Tomimbang, the man froze for a few seconds, looked straight at him, and then took off running. Officer Tomimbang testified that although it was dark because there was "no lighting" where he was standing, he saw the man's face clearly and noticed that it was the same man who had driven by earlier on the truck. During cross-examination, defense counsel asked Officer Tomimbang about the lighting conditions in the area. Specifically, defense counsel asked Officer Tomimbang about the sources of lighting, the strength of lighting, and whether the lights were functioning. Officer Tomimbang testified that although he was unsure as to the specific sources of lighting, "the street was pretty bright from the street lighting." Officer Domingo, who was near Officer Tomimbang, testified that he did not get a good look at the man.

As soon as the man sped off, Officer Tomimbang said, "Hey, police. Stop." Officer Tomimbang jumped over the fence and followed the man down Lulu Street. The man then dove into some hedges that led into a residential neighborhood. Officer Tomim-

bang decided not to follow and instead asked several other officers who had since arrived at the scene to form a perimeter to search the neighborhood. Officer Tomimbang believed that the man would not be able to escape because the neighborhood was surrounded by steep embankments. Officer Tomimbang then went over to the truck and asked dispatch to run its license plates. Dispatch indicated that the truck had been stolen.

Several other officers arrived within a few minutes. Approximately eleven officers canvassed the neighborhood. Officer Tomimbang described the suspect to them as a "local male, dark clothing," or possibly "local male, maybe short dark hair, dark clothing."

Sergeant Michael Kahikina was one of the officers who participated in the search. As he was walking along the back of a residence in the neighborhood, he flashed his light on a drainage ditch and observed that a man was lying sideways on the ditch. Sergeant Kahikina said, "Hey, police. Let me see your hands. Don't move."

There was conflicting testimony during trial regarding exactly what happened next. Sergeant Kahikina first testified that the man in the ditch tried to run and had to be tackled. According to Sergeant Kahikina, the man then stated, "I never do nothin'," and became compliant. On cross-examination, however, Sergeant Kahikina acknowledged that the man had not attempted to run but rather had tried to get up. Sergeant Kahikina put his hand on the suspect and held him down. Sergeant Kahikina then began calling out that he had apprehended a suspect. The suspect was wearing a brown shirt, dark blue jeans, and "possibly a hood."

Officer Tomimbang identified the suspect as the man whom he had seen driving the truck earlier and who had walked toward the construction area at the recreation center. In court, Officer Tomimbang identified the man as Petitioner. During cross-examination, Officer Tomimbang testified that his initial identification of the man in the ditch had taken place approximately thirteen minutes from the time he saw the man walking toward the construction area. Sergeant Ka-

hikina also identified Petitioner in court as the man who was lying on the ditch.

After the suspect was arrested, the officers investigated the scene further. Officer Tomimbang dusted the lids of the open containers at the construction site, but found no fingerprints. Officers Tomimbang and Domingo also examined the white truck. The truck's license plate number was 221–TRD, the same as the truck reported stolen from Waikele by Kotar on February 3, 2010. No fingerprints were found on the truck.

In the truck, the police found a duffel bag containing a combination lock that had been cut and some bolt-cutters. Richard Shiroma, an employee of the recreation center, identified the lock as the combination lock that was used to secure the gate. The police also found a number of construction tools that were later identified by Grant Kaulback, an employee of Frank Coluccio Construction, as belonging either to himself or to Frank Coluccio Construction. Respondent introduced evidence that the value of the items, together, exceeded $300.00.

The police, having determined that the truck matched the description of the truck reported stolen by Kotar, called Kotar and asked him to identify the vehicle. Kotar identified the truck as belonging to Leak Master. Kotar testified at trial that the truck was "pretty beat up," but was still operable.

### 3.

After Respondent presented its evidence, Petitioner asked the court to enter a judgment of acquittal. The court denied the request. The court then instructed the jury. Relevant here, the court discussed the prosecution's burden of proof, explaining that the jury had to presume that Petitioner was innocent "unless and until the prosecution proves the defendant guilty beyond a reasonable doubt." The court also instructed the jury as follows:

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility. Now inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to discredit such testimony. In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail and whether they result from innocent error or deliberate falsehood. If you find that a witness has deliberately testified falsely to any important fact or deliberately exaggerated or suppressed any important fact, then you may reject the testimony of that witness except for those parts which you nevertheless believe to be true. You are not bound to decide a fact one way or another just because more witnesses testify on one side than the other. It is testimony that has a convincing force upon you that counts, and the testimony of even a single witness, if believed, can be sufficient to prove a fact.

Subsequently, the parties delivered their closing arguments. During its closing argument, Respondent stressed that "Officer Tomimbang saw [Petitioner] with his own eyes as he was driving the vehicle," and that Officer Tomimbang "observed [Petitioner] walk up to him after [Petitioner] ... walked towards the Newtown area which is where Officer Tomimbang flashed his flashlight to his face seeing it's the same person." Re-

spondent also stated that each "witness testified credibly to what he saw on the date of the incident."

During its closing argument, the defense challenged Officer Tomimbang's eyewitness identification testimony as follows:

*[Officer Tomimbang's] observation was actually not very good. Let's look at the lighting here. The testimony is that there's a light. And there's pictures where you can see this light post on the street. The testimony is also that his vantage point was behind this post in a very dark courtyard—uh, construction yard-No matter all the testimony about where the light was, it's clear throughout his testimony in the courtyard behind this light he indicated several times that it was really dark.*

*And let's look at the time he had to observe what he observed.* He was up on this courtyard on a hill investigating.... [A]nd they hear a truck coming up. When the truck comes up, both Officers Tomimbang and Domingo indicated there was nothing really unusual. Officer Tomimbang said, well, I thought it was maybe one of the trucks with the employees coming. So their focus was not on this truck.

Did Officer Tomimbang see this truck and perhaps sees this driver? I think he did.... *Did he get a good look? No. Look at the distance. Officer Tomimbang laid out the scene for you. Two lanes, median lane, turning lane, and two more lanes, sidewalk, hill, fence, grass area. This is all distance.* This is at night. This is one, two o'clock in the morning....

Now from an angle [Officer Tomimbang] says he saw the person coming out [of the truck]. I don't think so. There's hedges in that corner, and the hill. That Lulu Street, it goes down. And he—this truck was parked 30 feet into the street. Any other lighting? Not in the area....

Now you got some pictures ... it looks pretty lit. But it's not lit. That's not how it looked like that night. It looked like that because they're using flash on the camera. That is not how it looked when the officers were there investigating....

*Other reasons to question the clarity of Officer Tomimbang. When he says he observed this male walk towards him and he put his flashlight to this person and he said he got a good look, no, he didn't. He got a look but not a good look.* His description, what he gave to dispatch.... He got a local male, dark hair, short hair. That's it.

This is an officer with a lot of training.... They know what to put in there.... They know to put as much detail as they can. And not even to dispatch. Somewhere in their report. And it was not there because there's nothing to add. *They didn't get a good look .....*

Officer Domingo added maybe about 5'8. But he says he didn't get a good look either. He didn't get to see the face. There's testimony that says that Officer Domingo recovered a hat. Sergeant Kahikina said this guy was wearing a jacket. There's a lot more stuff that could have been mentioned if they saw it.

*If this Officer Tomimbang saw this guy and he was that close, he would have had that information. He didn't because he didn't get a good look.* I call it the "Aha factor." *You got this very broad description that fits. You're in Hawai'i, in Aiea, this area. It fits a lot of people.*

(Emphases added.) Neither the court's oral instructions nor its written instructions included a specific instruction concerning eyewitness identification, and neither party requested one.

On May 19, 2010, the jury found Petitioner guilty of the two charged offenses. On July 19, 2010, the court sentenced Petitioner to two concurrent five-year terms of probation.

## B.

Before the ICA, Petitioner argued that the court committed plain error by failing to provide a cautionary instruction stating the factors to be considered by the jury in assessing eyewitness identification evidence. In a summary disposition order, the ICA held that whether to give a cautionary instruction was within the court's discretion and that, in this case, defense counsel's opening and closing statements, her cross-examination of Officer Tomimbang, and the court's

general instructions adequately directed the attention of the jury to the identification evidence. The ICA therefore affirmed Petitioner's conviction.

### C.

Petitioner presents the following question in his Application to this court:

> Whether the ICA gravely erred in holding that the circuit court did not commit plain error by failing to provide a jury instruction regarding eyewitness identification because the opening statement by defense counsel, the cross-examination of Officer Eutiquito Tomimbang Jr. of the Honolulu Police Department ("HPD"), defense counsel's closing argument, and the general jury instructions adequately directed the attention of the jury to the identification evidence.

Respondent did not file a Response to the Application.

### D.

Petitioner argues that a cautionary jury instruction regarding eyewitness identification should be required in any case in which eyewitness identification is a "critical" or "central" issue.[7] Petitioner recognizes that this court has repeatedly held that the giving of special instructions regarding eyewitness identification is within the discretion of the trial court. (Citing *State v. Padilla*, 57 Haw. 150, 162, 552 P.2d 357, 365 (1976); *State v. Pahio*, 58 Haw. 323, 331–32, 568 P.2d 1200, 1206 (1977); *State v. Okumura*, 78 Hawai'i 383, 404–05, 894 P.2d 80, 101–02 (1995); *State v. Vinge*, 81 Hawai'i 309, 316–17, 916 P.2d 1210, 1217–18 (1996)). However, Petitioner urges this court to reconsider those decisions in light of the widely-recognized perils of eyewitness identification testimony. Petitioner cites to several other states that have abandoned the discretionary approach and adopted the position that a cautionary instruction must be given whenever an eyewitness's identification is the central issue in the case. (Citing *State v. Long*, 721 P.2d 483 (Utah 1986); *State v. Warren*, 230 Kan. 385,

635 P.2d 1236 (1981); *Commonwealth v. Rodriguez*, 378 Mass. 296, 391 N.E.2d 889 (1979)).

In the alternative, Petitioner argues that if this court does not adopt a rule requiring circuit courts to give a specific instruction whenever eyewitness identification is the central issue in the case, we should hold that the ICA nevertheless gravely erred in concluding that the court had not committed plain error in not exercising its discretion to provide such an instruction.

### E.

#### 1.

In 1976, this court for the first time considered a due process challenge to eyewitness identification testimony in *Padilla*, 57 Haw. at 153–55, 552 P.2d at 360–61. Following the rule announced by the United States Supreme Court in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), *Padilla* held that the use of *unreliable* eyewitness identification testimony could violate a defendant's due process rights, but that whether constitutional rights were affected depended on the "totality of the circumstances." *Padilla*, 57 Haw. at 153–55, 552 P.2d at 360–61. The reliability of eyewitness testimony was said to depend upon:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness during the confrontation, and the length of time between the crime and the confrontation[.]

*See id.* (citing *Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375).

*Simmons* and *Biggers*, on which *Padilla* relied, were the Supreme Court's responses to the risk that unreliable eyewitness testimony might result in misidentification, undermining the fairness of trial. *See Manson v. Brathwaite*, 432 U.S. 98, 113, 97 S.Ct.

---

**7.** However, at oral argument, Petitioner contended that the instruction should instead be given if there is any evidence that eyewitness identification evidence is a factor in the prosecution.

2243, 53 L.Ed.2d 140 (1977). The Court was unwilling, however, to go so far as to adopt a blanket rule barring eyewitness testimony, even in cases where the police employed unduly suggestive identification procedures. *Id.* at 112, 97 S.Ct. 2243. The Court expressed concern that the exclusion of "reliable" eyewitness testimony might result in the "guilty going free." *Id. Padilla,* following the Court's lead, also left to the circuit court's discretion the decision of whether to give a specific jury instruction in cases where eyewitness testimony is "a key issue" in the case. *Id.* at 161–62, 552 P.2d at 364–65. In exercising that discretion, *Padilla* stated that circuit courts had to consider whether cross-examination, the arguments made to the jury, and the rest of the jury instructions adequately directed the jury's attention to the identification testimony, rendering the more specific instruction unnecessary. *Id.*

More recently, in *Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 720–21, 181 L.Ed.2d 694 (2012), the Court held that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification that was not procured under unnecessarily suggestive circumstances arranged by law enforcement. Justice Sotomayor dissented and would have held that it is not necessary for law enforcement to create the suggestive circumstances in order for a preliminary judicial inquiry to be warranted. *Id.* at 733–34, 132 S.Ct. 716 (Sotomayor, J., dissenting).

### 2.

Since the first cases addressing the reliability of eyewitness testimony were decided in the 1970s, a robust body of research in the area of eyewitness identification has emerged. Many studies now confirm that false identifications are more common than was previously believed. For example, Professor Brandon L. Garrett concluded in a study involving 250 exonerated defendants that "[e]yewitnesses misidentified 76% of the exonerees (190 of 250 cases)." Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong,* 48 (2011). Professor Garrett's original study of 200 such cases in 2008 concluded that eyewitness identification testimony was the leading contributing factor to wrongful convictions and was four times more likely to contribute to a wrongful conviction than a false confession. Brandon L. Garrett, *Judging Innocence,* 108 Colum. L. Rev. 55, 76 (2008). Other studies have reached similar results. *See, e.g.,* Edward Connors, et. al., *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence after Trial,* 15, 96 (1996), *available at* https://www.ncjrs.gov/pdffiles/dnaevid.pdf (reviewing 28 sexual assault cases in which defendants were later exonerated and concluding that *all* cases, except those involving homicide, "involved victim eyewitness identification both prior to and at trial," and that in those cases "eyewitness testimony was the most compelling evidence"); Gary L. Wells, et. al., *Recommendations for Properly Conducted Lineup Identification Tasks, in Adult Eyewitness Testimony: current Trends and Developments* 223–24 (1994) (studying over 1,000 wrongful convictions and concluding that recall errors by witnesses were the leading cause of such convictions).

Researchers have found that several variables tend to affect the reliability of an eyewitness's identification. These include the passage of time,[8] witness stress,[9] duration of exposure,[10] distance,[11] "weapon focus"[12] (vi-

---

**8.** *See* Cutler, *A Sample of Witness, Crime, and Perpetrator Characteristics Affecting Eyewitness Identification Accuracy,* 4 Cardozo Pub. L. Pol'y & Ethics J. 327, 336 (2006).

**9.** Deffenbacher, et. al., *A Meta–Analytic Review of the Effects of High Stress on Eyewitness Memory,* 28 Law & Hum. Behav. 687, 694 (2004) (analyzing 27 studies).

**10.** *See* Memon, et. al., *Exposure Duration: Effects on Eyewitness Accuracy and Confidence,* 94 British J. Psychol. 339, 345 tbl. 1 (2003).

**11.** *See* Loftus & Harley, *Why is it Easier to Identify Someone Close Than Far Away?,* 12 Psychonomic Bull. & Rev. 43, 63 (2005) (concluding that for people with normal vision the ability to identify faces begins to diminish at approximately 25 feet).

**12.** *See* Wells, et. al., *Eyewitness Evidence: Improving Its Probative Value,* 7 Psychol. Sci. in Pub. Int. 45, 53 (2006).

sual attention eyewitnesses give to a perpetrator's weapon during crime), and cross-race bias [13] (eyewitnesses are more accurate at identifying persons of their own race). Juries, however, may not be aware of the extent to which these factors affect an individual's ability to make an accurate identification, and thus tend to "over believe" witness identification testimony. In a 1983 study, for example, researchers presented individuals with crime scenarios derived from previous empirical studies. *See* Brigham & Bothwell, *The Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identifications*, 7 Law & Hum. Behav. 19, 22–24 (1983). Researchers found that the study's respondents estimated an average accuracy rate of 71 percent for a highly unreliable scenario in which only 12.5 percent of eyewitnesses had in fact made a correct identification. *See id.*

Empirical research has also undermined the common sense notion that the confidence of the witness is a valid indicator of the accuracy of the identification. *See Long*, 721 P.2d at 490 (explaining that the accuracy of an identification is only poorly associated with witness confidence and is sometimes inversely associated with witness confidence) (citing K. Deffenbacher, *Eyewitness Accuracy and Confidence: Can We Infer Anything About Their Relationship?*, 4 Law & Hum. Behav. 243 (1980); Lindsay, et. al., *Can People Detect Eyewitness–Identification Accuracy Within and Across Situations?*, 66 J. Applied Psych. 79, 80–82 (1981)). However, courts and juries continue to place great weight on the confidence expressed by the witness in assessing reliability. *See* Cutler & Penrod, *Jury Sensitivity to Witness Identification Testimony*, 14 Law & Hum. Behav. 185, 185 (1990) (finding that what most affects jurors' assessment of witness identifica-

tion testimony is the confidence expressed by the witness).

### 3.

One of the justifications often advanced for the continued use of eyewitness testimony despite its well-documented weaknesses is the proposition that any danger that a jury might give undue weight to an unreliable identification can be mitigated by the use of "appropriate jury instructions," along with the "strong presumption" that juries will follow such instructions.[14] *See, e.g., United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972); *see also State v. Klinge*, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) ("[J]uries are presumed to follow all of the trial court's instructions.") (internal quotations and citations omitted).

In *Perry*, the Court grounded its holding that due process does not require a preliminary inquiry into the reliability of an eyewitness identification not arranged by law enforcement, in part, on the fact that there are "safeguards built into [the] adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability." *Perry*, 132 S.Ct. at 728. According to the Court, one of these safeguards is the use of "[e]yewitness-specific jury instructions, which many federal and state courts have adopted, [which] likewise warn the jury to take care in appraising identification evidence." *Id.* at 728–89.

In this regard, several other jurisdictions have decided to abandon the discretionary approach to jury instructions and now require trial courts to give a specific instruction whenever eyewitness identification is central to the case and the defendant requests the instruction.[15] For example, in *Warren*, the

---

**13.** *See* Meissner & Brigham, *Thirty Years of Investigating the Own–Race Bias in Memory for Faces*, 7 Psychol., Pub. Pol'y & L. 3, 15, 21 (2001).

**14.** *See also* Brief for United States as Amicus Curiae Supporting Respondent at 29–30, *Perry*, cert. granted, 131 S.Ct. 2932 (filed August 5, 2011) (No. 10–8974).

**15.** In *Perry*, the Court explained that many federal and state courts have adopted jury instructions to warn the jury to take care in apprising identi-

fication evidence. 132 S.Ct. at 728–29. The Court gave the following as examples:

> Model Crim. Jury Instr. No. 4.15 (CA3 2009); *United States v. Holley*, 502 F.2d 273, 277–278 (C.A.4 1974); Pattern Crim. Jury Instr. No. 1.29 (CA5 2001); Pattern Crim. Jury Instr. No. 7.11 (CA6 2011); Fed. Crim. Jury Instr. No. 3.08 (CA7 1999); Model Crim. Jury Instr. for the District Courts No. 4.08 (CA8 2011); Model Crim. Jury Instr. No. 4.11 (CA9 2010); Crim. Pattern Jury Instr. No. 1.29 (CA10 2011); Pattern Jury Instr. (Crim. Cases) Spec.

Supreme Court of Kansas held that "in *any* criminal action in which eyewitness identification testimony is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given[.]" [16] 635 P.2d at 1244 (emphasis added). That court emphasized the need to recognize the "serious nature" of the "problems inherent" in eyewitness identification testimony, noting the "great volumes of articles on the subject[,]" and the "potential for injustice." *Id.* at 1239–42.

Likewise, the Supreme Court of Utah, concluding that there is "no significant division of opinion on the issue" and that "[t]he studies all lead inexorably to the conclusion that human perception is inexact[,]" decided to adopt "a more rigorous approach to cautionary instructions[.]" [17] *See Long,* 721 P.2d at 488. That court explained that although research has convincingly demonstrated the dangers of eyewitness identification testimony, "[p]eople simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness." *Id.* at 490. The Utah court therefore held that a cautionary jury instruction was required whenever eyewitness identification testimony is a central issue in the case and the defendant requests the instruction. *Id.* at 492.

The Supreme Court of New Jersey also held that "[w]hen identification is a 'key issue,' the trial court must instruct the jury on

identification, even if a defendant does not make that request." *State v. Cotto,* 182 N.J. 316, 865 A.2d 660, 665 (2005). In *State v. Cromedy,* that court more specifically held that when cross-racial identification testimony is critical to the case and the identification is not corroborated, trial courts must give a cautionary instruction. *See* 158 N.J. 112, 727 A.2d 457, 467–68 (1999). More recently, the New Jersey Supreme Court reconsidered its position in light of additional research on cross-race bias and decided to impose a more stringent standard.[18] *State v. Henderson,* 208 N.J. 208, 27 A.3d 872, 926 (2011).

New Jersey trial courts are now required to give a cautionary instruction "whenever cross-racial identification is in issue at trial[,]" regardless of whether it is a "critical" issue. *Id.* In fact, *Henderson* more broadly held that "enhanced instructions [must] be given to guide juries about the various factors that may affect the reliability of an identification in a particular case." *Id.* at 924. The instructions "are to be included in the court's comprehensive jury charge at the close of evidence"—regardless of whether the defendant requests them. *See id.* Accord *Commonwealth v. Pressley,* 390 Mass. 617, 457 N.E.2d 1119, 1121 (1983) (when the facts permit it and the defendant requests it, "[f]airness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification").

### F.

This court has repeatedly reaffirmed *Padilla*'s holding that the decision to give a

Instr. No. 3 (CA11 2010); Rev. Ariz. Jury Instr., Crim., No. 39 (3d ed. 2008); 1 Judicial Council of Cal. Crim. Jury Instr. No. 315 (Summer 2011); Conn. Crim. Jury Instr. 2.6–4 (2007); 2 Ga. Suggested Pattern Jury Instr. (Crim. Cases) No. 1.35.10 (4th ed. 2011); Ill. Pattern Jury Instr., Crim., No. 3.15 (Supp. 2011); Pattern Instr., Kan.3d, Crim., No. 52.20 (2011); 1 Md. Crim. Jury Instr. & Commentary §§ 2.56, 2.57(A), 2.57(B) (3d ed. 2009 and Supp. 2010); Mass. Crim. Model Jury Instr. No. 9.160 (2009); 10 Minn. Jury Instr. Guides, Crim., No. 3.19 (Supp. 2006); N.H. Crim. Jury Instr. No. 3.06 (1985); N.Y. Crim. Jury Instr. "Identification–One Witness" and "Identification–Witness Plus" (2d ed. 2011); Okla. Uniform Jury Instr., Crim., No. 9–19 (Supp. 2000); 1 Pa. Suggested Standard Crim. Jury Instr. No. 4.07B (2d ed. 2010); Tenn. Pattern Jury Instr., Crim., No. 42.05 (15th ed. 2011); Utah Model

Jury Instr. CR404 (2d ed. 2010); Model Instructions from the Vt. Crim. Jury Instr. Comm. Nos. CR5–601, CR5–605 (2003); W. Va. Crim. Jury Instr. No. 5.05 (6th ed. 2003). *Id.* at 729 n. 7.

**16.** The Kansas model jury instruction is among the instructions cited by the Court in *Perry,* 132 S.Ct. at 729 n. 7.

**17.** The Utah model jury instruction is among the instructions cited by the Court in *Perry,* 132 S.Ct. at 729 n. 7.

**18.** Justice Sotomayor cites *Henderson* in her dissent in *Perry* in discussing the strength of the empirical evidence that supports the proposition that eyewitness misidentifications are a leading source of wrongful convictions. *Perry,* 132 S.Ct. at 738 (Sotomayor, J., dissenting).

cautionary instruction is for the trial court to make in the exercise of its discretion. *See Pahio,* 58 Haw. at 331, 568 P.2d at 1206; *Okumura,* 78 Hawai'i at 404–05, 894 P.2d at 101–02; *Vinge,* 81 Hawai'i at 316–17, 916 P.2d at 1217–18. But none of those cases have considered whether *Padilla*'s holding should be re-examined in light of what is now known about the weaknesses of eyewitness identification testimony.

The reason stated in our case law in support of the existing rule is, in essence, that a specific eyewitness identification instruction would be superfluous in light of the defendant's opening statement, cross-examination of the witness, and closing argument. *See Okumura,* 78 Hawai'i at 405, 894 P.2d at 80. But if the instruction is merely superfluous, then there is no harm in giving the instruction when identification is a critical issue. At most, giving the instruction would take a few minutes of the court's time. *Warren,* 635 P.2d at 1244.

Moreover, requiring trial courts to give cautionary instructions rather than relying on defense counsel to point out flaws in the witness's testimony during opening statements, cross-examination, or closing arguments has merit. Cross-examination may not adequately apprise the jury of the factors it should consider in assessing the reliability of eyewitness identification testimony or of the deficiencies of eyewitness identification testimony. Additionally, court instructions are more authoritative than lawyers' opening statements and closing arguments. Jurors may very well ignore counsel's admonitions about the factors that affect reliability, but the law generally presumes that juries follow court instructions. *See Klinge,* 92 Hawai'i at 592, 994 P.2d at 524.

Without appropriate instructions from the court, the jury may be left without sufficient guidance on how to assess critical testimony, sometimes the only testimony, that ties a defendant to an offense. Although a jury may intuit some of the factors that affect the reliability of such testimony, this court does not "rely on jurors to divine rules themselves from cross-examination or summation." *Henderson,* 27 A.3d at 896. "Even with matters that may be considered intuitive [such as

the factors that affect the reliability of eyewitness testimony], courts [should] provide focused jury instructions." *Id.*

Most significantly, the impetus for a change in our approach lies in the empirical research that reveals that people generally do not understand all of the factors that affect the reliability of an eyewitness identification. In her dissent in *Perry,* Justice Sotomayor cited a great deal of the empirical evidence that has called into question the reliability of eyewitness identifications. 132 S.Ct. at 731–40. Justice Sotomayor recounted how the Court's precedents had "pointed to the 'formidable' number of 'miscarriage[s] of justice from mistaken identification' in the annals of criminal law." *Id.* at 731 (brackets in original) (citation omitted). Justice Sotomayor then reasoned:

> The empirical evidence demonstrates that eyewitness misidentification is " 'the single greatest cause of wrongful convictions in this country.' " Researchers have found that a staggering 76% of the first 250 convictions overturned due to DNA evidence since 1989 involved eyewitness misidentification. Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police-orchestrated procedures.

*Id.* at 738–39 (footnotes omitted).

 It is apparent from both the majority's opinion and Justice Sotomayor's dissent in *Perry* that, based on the empirical studies, it cannot be assumed that juries will necessarily know how to assess the trustworthiness of eyewitness identification evidence. *See id.* Under these circumstances, we hold that when eyewitness identification is central to the case, circuit courts must give a specific jury instruction upon the request of the defendant to focus the jury's attention on the

trustworthiness of the identification.[19] A circuit court may also give a specific eyewitness instruction, in the exercise of its discretion, if it believes the instruction is otherwise warranted in a particular case.

## G.

 The following instruction, the earlier requested version of which was cited in *State v. Vinge*, 81 Hawai'i 309, 314, 916 P.2d 1210, 1215 (1996), would appropriately address the general concerns described above. The instruction cited in *Vinge* is an older California model instruction, California Jury Instructions Criminal (CALJIC) 2.29 (1988).[20] *Vinge* does not contain the entire instruction, but quotes only the factors the jury should consider. *See Vinge*, 81 Hawai'i at 314–15, 916 P.2d at 1215–16. The first paragraph of the instruction reproduced below is part of an additional instruction given in *Vinge*, which is necessary to alert the jury that the prosecution has the burden of proving a defendant's identity beyond a reasonable doubt. The next two paragraphs, adopted with slight modifications from the current California model instruction, are quoted for the sake of completeness, and are followed by the factors mentioned in *Vinge*.

[T]he burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.

You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave accurate testimony.

In evaluating identification testimony, consider the following factors:

The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

The stress, if any, to which the witness was subject at the time of the observation;

The witness' ability, following the observation, to provide a description of the perpetrator of the act;

The extent to which the defendant fits or does not fit the description of the perpetrator previously given by the witness;

The cross-racial or ethnic nature of the identification;

The witness' capacity to make an identification;

[Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;] [21]

[Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;]

The period of time between the alleged criminal act and the witness' identification;

Whether the witness had prior contacts with the alleged perpetrator;

The extent to which the witness is either certain or uncertain of the identification;

Whether the witness identification is in fact the product of his own recollection;

Any other evidence relating to the witness' ability to make an identification.

*Id.; see also* CALCRIM No. 315. By identifying this instruction as sufficient to address the general concerns identified above, we do not intend to preclude modification of this instruction or the development of other related instructions. Accordingly, we refer this instruction to the Committee on Pattern Criminal Jury Instructions for future comments, suggestions, and any recommended modifications.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ James E. Duffy, Jr.

/s/ Sabrina S. McKenna

---

**19.** As previously noted, the dissent would hold that the instruction should be given *sua sponte* when eyewitness identification is central to the case.

**20.** The new California model jury instruction, Judicial Council of California Criminal Jury Instructions (CALCRIM) No. 315 (2011), is among the instructions cited by the Court in *Perry*, 132 S.Ct. at 729 n. 7.

**21.** The bracketed portions of the instruction would only be given if applicable.

*PART II: LIMITATION ON JURY IN-
STRUCTION RULE AND APPLI-
CATION TO THIS CASE*

(By: RECKTENWALD, C.J., with whom
NAKAYAMA, DUFFY and McKENNA, JJ.,
concur)

A. The new rule is applied prospectively
and the instruction is given at the re-
quest of the defendant

■ This court's holding that "in criminal
cases, the circuit courts must give the jury a
specific eyewitness identification instruction
whenever identification evidence is a central
issue in the case, and it is requested by the
defendant," marks a departure from the pri-
or approach in this jurisdiction.

Previously, the decision to give a special
instruction on eyewitness identification rest-
ed within the sound discretion of the trial
court. *See Padilla,* 57 Haw. at 162, 552 P.2d
at 365; *Pahio,* 58 Haw. at 331, 568 P.2d at
1206; *Okumura,* 78 Hawai'i at 404–05, 894
P.2d at 101–02; *Vinge,* 81 Hawai'i at 316, 916
P.2d at 1217. However, as noted in Part I,
there is substantial scholarship and empirical
research indicating that there are a number
of factors that can affect the reliability of
eyewitness identification. Moreover, mis-
identification is one of the leading causes of
wrongful convictions. Accordingly, we are
exercising our supervisory powers in order to

ensure that, upon request of the defendant
when identification is a central issue, the jury
will be specifically instructed as to the poten-
tial factors which can affect the reliability of
eyewitness testimony. *See* HRS § 602-4.[22]
This court has previously invoked its supervi-
sory powers to adopt new procedural re-
quirements to prevent error in the trial
courts, *see, e.g., Shak v. Doi,* 49 Haw. 404,
406–07, 420 P.2d 100, 102 (1966) ("[T]he
court, in the exercise of its supervisory pow-
er, here states that if a defendant requests a
copy of the charge he should be furnished it,
whether the charge be in the form of a
written complaint or an oral charge. This
will better assure fulfillment of the require-
ment that the court be satisfied defendant
understands the charge against him."), and
we do so here as well.

Our holding does not require a trial court
to give the instruction unless the defendant
requests it.[23] This recognizes that a defen-
dant may legitimately conclude, as a matter
of trial strategy, that the instruction is not
necessary or appropriate in a given case.
The truth-seeking function is furthered by
giving the defendant the option of not re-
questing the instruction, and accordingly we
respectfully disagree with the dissent's posi-
tion that the instruction must be given
whether requested or not.[24] *See* Dissenting

22. HRS § 602-4 (1993) provides, "The supreme
court shall have the general superintendence of
all courts of inferior jurisdiction to prevent and
correct errors and abuses therein where no other
remedy is expressly provided by law."

23. The model instruction contained herein is dif-
ferent from other jury instructions that this court
has held trial courts are required to give *sua
sponte* when there is support in the record, be-
cause the model instruction does not articulate a
type of defense, but rather directs the jury to
consider certain factors in evaluating identifica-
tion testimony. *Cf. State v. Stenger,* 122 Hawai'i
271, 281, 226 P.3d 441, 452 (2010) (holding that
the trial court should have *sua sponte* instructed
the jury on the mistake-of-fact defense where
there was support in the record). Accordingly,
we respectfully disagree with the dissent's sug-
gestion that the eyewitness instruction should be
required even in the absence of a request by a
defendant. Dissenting Opinion at 318-19, 277
P.3d at 1043–44.

24. The dissent relies on *State v. Haanio,* 94 Ha-
wai'i 405, 16 P.3d 246 (2001), and *State v. Davis,*
63 Haw. 191, 624 P.2d 376 (1981), for the propo-

sition that the eyewitness instruction should be
given, even in the absence of a request from the
defendant. *See* Dissenting Opinion at 320, 277
P.3d at 1045. Respectfully, *Haanio* and *Davis* are
distinguishable.

In *Haanio,* this court held that "trial courts
must instruct juries as to any included offenses
when there is a rational basis in the evidence[.]"
94 Hawai'i at 413, 16 P.3d at 254 (quotation
marks omitted). This court noted that allowing a
trial court to forego a required included offense
instruction if the defendant did not want it would
result in an "all or nothing" approach that forces
"the jury to choose between conviction and ac-
quittal on the greater charge[,]" thereby "fore-
close[ing] the determination of criminal liability
where it may in fact exist." *Id.* at 414, 16 P.3d
at 255 (citation omitted). Here, the absence of
an eyewitness jury instruction does not result in
an "all or nothing" approach.

Similarly, *Davis* is inapposite. In *Davis,* this
court examined the constitutionality of Hawai'is
notice-of-alibi rule, which imposes certain notifi-
cation requirements on the defendant and prose-
cutor if the defendant intends to rely upon an

Opinion at 319-20, 277 P.3d at 1044–45. For example, where the circumstances of the identification lend weight to its reliability, the defendant may wish to focus the jury's attention on other issues in the case.[25]

Other appellate courts have expressly relied on their supervisory powers when departing from a discretionary approach in the giving of a special instruction on eyewitness identification and have prospectively applied the new rule. The Supreme Court of Connecticut, in *State v. Ledbetter*, 275 Conn. 534, 881 A.2d 290, 318 (2005), exercised its supervisory powers to fashion a new jury instruction requirement concerning eyewitness identification. The Connecticut court recognized that it "[had] invoked [its] supervisory authority to provide guidance concerning jury instructions in the past." *Id.* The Connecticut court stated, "In light of the importance of eyewitness identification evidence and the conclusions to be drawn from the scientific research discussed [*supra* ], we conclude that it is appropriate to invoke that authority again to mitigate the potential risk of mistaken identification." *Id.* Accordingly, the Connecticut court "direct[ed] the trial courts of [its] state to incorporate an instruction in the charge to the jury" "for use by [its] trial courts in such cases in the future[.]" *Id.*

The Supreme Court of Utah also exercised its supervisory authority in *Long* when it abandoned the discretionary approach. 721 P.2d at 492. The Utah court held, "We therefore today abandon our discretionary approach to cautionary jury instructions and direct that *in cases tried from this date forward, trial courts shall give such an in-struction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense.*" *Id.* (emphasis added). The Utah court further stated:

> Given the great weight jurors are likely to give eyewitness testimony, and the deep and generally unperceived flaws in it, to convict a defendant on such evidence without advising the jury of the factors that should be considered in evaluating it could well deny the defendant due process of law under article I, section 7 of the Utah Constitution.

*Id.*

In a subsequent case, *State v. Stilling*, 770 P.2d 137, 143 (Utah 1989), the Supreme Court of Utah clarified that the rule it adopted in *Long* arose under its supervisory powers rather than federal or state constitutional principles. In *Stilling*, the defendant argued before the Utah court that it should "retroactively apply" *Long's* holding that "cautionary eyewitness identification instructions must be given 'whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense.'" *Id.* (quoting *Long*, 721 P.2d at 492). The defendant "cite[d] dicta in *Long* where [the court] wrote that failure to provide eyewitness identification instructions 'could very well deny the defendant due process of law under article I, section 7 of the Utah Constitution.'" *Id.* The Utah court rejected the defendant's equal protection and due process arguments by explaining that the court "decided *Long* on neither federal nor state constitutional principles, but rather as a result of our *supervisory capacity* over the lower

---

alibi defense. 63 Haw. at 193–94, 624 P.2d at 378. This court stated, "The adversary system of trial is hardly an end in itself; it is not a poker game in which players enjoy an absolute right always to conceal their cards until played." *Id.* at 194, 624 P.2d at 378 (quoting *Williams v. Florida*, 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)). "Given the ease with which an alibi can be fabricated," the notice-of-alibi rule protects the State against "an eleventh-hour defense[.]" *Id.* (quoting *Williams*, 399 U.S. at 81, 90 S.Ct. 1893). Respectfully, *Davis* has little relevance because defendants forgoing an eyewitness jury instruction cannot fairly be described as "players. conceal[ing] their cards until played." *Id.* (quoting *Williams*, 399 U.S. at 82, 90 S.Ct. 1893).

25. As noted in Part I, researchers have found that several variables tend to affect the reliability of an eyewitness's identification. However, whether jury instructions on eyewitness identification actually have a positive effect on juror sensitivity has not been conclusively proven, and some studies have found that certain instructions may even reduce juror sensitivity. See Brian L. Cutler & Steven D. Penrod, Mistaken Identification: The Eyewitness, Psychology, and the Law 263 (1995) ("[T]he evidence indicates that Telfaire instructions—perhaps because they confuse jurors—actually reduced juror sensitivity to witnessing and identification conditions compared to uninstructed jurors.").

courts." *Id.* (emphasis added). Accordingly, the Utah court in *Stilling* explained that "[s]ince defendant's case was tried before *Long* became law, we evaluate defendant's claim under the pre-*Long* standard which left the giving of a cautionary instruction to the discretion of the trial judge under the 'totality of the circumstances.'" *Id.* (quoting *State v. Branch*, 743 P.2d 1187, 1190 (Utah 1987)).

Similar to the Utah court, the shift in this jurisdiction's approach to the giving of a special jury instruction on eyewitness identification is rooted in our supervisory powers. Accordingly, we hold that this rule should be given prospective effect. *See id.* (clarifying the prospective effect of the rule in *Long*); *see also State v. Dyle*, 899 S.W.2d 607, 612–13 (Tenn.1995) (holding that the adopted instruction "must be given when identification is a material issue and it is requested by defendant's counsel[,]" but noting that "[w]e do not apply this new rule to the case under submission" because "the instruction given at trial was correct under the law then in effect"); *Ledbetter*, 881 A.2d at 318–19 (stating that the specific jury instruction the court had adopted was "for use by [its] trial courts in such cases in the future" and upholding the conviction in the case before it despite the absence of such an instruction in the underlying trial). Thus, as to the instant case and other cases that are currently pending on direct appeal, this court will apply the rule then in effect when the cases were tried.[26]

**B. Cabagbag's conviction is affirmed under the rule then in effect when he was tried**

■ In analyzing Cabagbag's case, "we must examine all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the identification evidence." *Okumura*, 78 Hawai'i at 405, 894 P.2d at 102; *see also Padilla*, 57 Haw. at 161–62, 552 P.2d at 364–65 (stating that the cross-examination, the arguments made to the jury, and the rest of the jury instructions adequately directed the jury's attention to the identification evidence, rendering a more specific instruction unnecessary).

Cabagbag argues that under this rule, the circuit court "commit[ted] plain error for failing to provide such an instruction because the jury's attention was not adequately drawn to the identification issue." The record, however, indicates that the jury's attention was adequately drawn to the eyewitness identification issue at trial by the opening statements and closing arguments of counsel, the cross-examination of prosecution witnesses, and the general instructions given by the court.[27] Identification was a primary issue in the case, and both the DPA and defense counsel focused the jury's attention on this issue from the start of trial. During

---

**26.** Our holding does not involve selective application of the new rule, Dissenting Opinion at 323–24, 277 P.3d at 1048–49, but rather is consistent with our approach in other cases. *See Haanio*, 94 Hawai'i at 407, 407 n. 1, 16 P.3d at 248, 248 n. 1 (2001) (holding that "in jury trials beginning *after* the filing date of this opinion, the trial courts shall instruct juries as to any included offenses having a rational basis in the evidence" and noting that prospective application of the new rule "would *not* involve selective application to similarly situated defendants" because the "rule is not applied to the instant case on appeal or any other case in which trial has been completed") (emphasis added). To the contrary, under our holding, Cabagbag and all defendants whose cases are pending on direct appeal will be treated the same, i.e., their claims will be evaluated under the rule in effect at the time they were tried. *See State v. Garcia*, 96 Hawai'i 200, 214, 29 P.3d 919, 933 (2001) (noting that "when this court announces a new rule that benefits a defendant *and applies the rule to the defendant in*

*the case in which the rule is announced,* it must be applied to all "'similarly situated defendants'"") (quoting *State v. Jackson*, 81 Hawai'i 39, 51, 912 P.2d 71, 83 (1996)).

The cases cited by the dissent are not to the contrary, and stand for the proposition that it is inequitable to apply a new rule in a case in which the rule is announced, but not to others on direct appeal. In sum, "'the nature of judicial review precludes us from simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new [rules], and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.'" *Garcia*, 96 Hawai'i at 213, 29 P.3d at 932 (quoting *State v. Kekona*, 77 Hawai'i 403, 411 n. 3, 886 P.2d 740, 748 n. 3 (1994) (Levinson, J., concurring and dissenting)).

**27.** We do not suggest that lawyer argument alone is sufficient to draw the jury's attention to factors affecting eyewitness identification. Dissenting Opinion at 321–22, 277 P.3d at 1046–47. Rather, we examine all aspects of the trial, including

her opening statement, the DPA noted that after Officer Tomimbang "shines his light in [defendant's] face" and asks, " 'What are you doing here?,' " "[t]he defendant freezes for a second then takes off, flees across the street towards the truck where he had parked[.]" Later, defense counsel pointed out during her opening statement, "Now the officer will say that he sees a male in there, a local male, short dark hair. That's the description. That's what he sees. It's dark, clearly at 1:07 in the morning." Defense counsel concluded her opening statement by saying, "There were no other witnesses other than Officer Tomimbang who saw the truck drive up. The evidence will be simply that." These statements, among others, alerted the jury that there were potential issues with Officer Tomimbang's identification of Cabagbag from the start of trial.

This focus on the identification issue continued throughout the examination of witnesses by both the DPA and defense counsel. During cross-examination of Officer Tomimbang, defense counsel directed the jury's attention to the circumstances surrounding the officer's viewing of the truck driver. Defense counsel asked Officer Tomimbang about, inter alia, the lighting conditions, the angle from which he made his observation, and his degree of attention. In response to these questions, Officer Tomimbang testified about the sources of lighting and the strength of lighting. Officer Tomimbang also testified that it was "probably ten minutes" between the time he saw the driver dive into the hedges until he heard Sergeant Kahikina call out that he had a possible suspect. Sergeant Kahikina, who discovered Cabagbag "lying down in the drainage" after the search commenced, testified that "[a]s soon as Officer Tomimbang came, he identified the person that [Sergeant Kahikina] had detained as the suspect that he was running after."

During closing arguments, defense counsel again highlighted for the jury the conditions in which Officer Tomimbang made his observations, as well as perceived weaknesses in Officer Tomimbang's testimony. Defense counsel directed the jury to consider, inter alia, the "lighting" conditions, the amount of

"time" Officer Tomimbang spent viewing the driver, and the "distance" between Officer Tomimbang and the driver. Defense counsel specifically asked the jury, "Did he get a good look? No." Defense counsel then gave other reasons to question Officer Tomimbang's identification, including the general description he gave of the driver. Thus, the factors that could have affected the reliability of the identification were pointed out by defense counsel.

Moreover, we are satisfied that in this particular case, the court's general instructions drew adequate attention to the factors that defense counsel put at issue and Officer Tomimbang testified about. Specifically, the court explained that the jury could consider a number of factors in deciding on the weight and credibility of a witness's testimony, including the witness's "means and opportunity of acquiring information" and "the probability or improbability of the witness's testimony." These instructions, taken together with the other aspects of the trial discussed *supra*, sufficiently guided the jury; they apprised the jury that it could consider factors such as lighting, distance, and timing, in assessing the weight and credibility of Officer Tomimbang's testimony. Accordingly, Cabagbag's argument that the jury's attention was not adequately focused on the identification issue lacks merit, and the trial court did not abuse its discretion in declining to *sua sponte* give an instruction in this particular case.

Thus, we affirm Cabagbag's Judgment of Conviction and Probation and Sentence filed on July 19, 2010. Because Cabagbag's judgment of conviction is affirmed, we affirm the ICA's judgment on appeal for the reasons set forth in this opinion.

## PART III: DISSENT TO (1) REQUIRING THAT DEFENDANTS REQUEST EYEWITNESS INSTRUCTION AND (2) PROSPECTIVE APPLICATION OF INSTRUCTION REQUIREMENT

ACOBA, J.

With the court, I agree that juries must be instructed on which factors to consider in

---

cross-examination and the court's instructions, taking into account the specific factors that could have affected the reliability of the identification

in the instant case. Here, we conclude that the jury's attention was adequately focused on the

assessing the reliability of eyewitness identification testimony. I write separately on two matters: (1) in my view, the court should give the instruction as a matter of course whenever eyewitness identification testimony is critical to the case, and (2) such an instruction should be given in this case and its omission would not be harmless. I therefore respectfully dissent in these two respects to the opinion expressed in Part II (hereinafter "majority").

### A.

When a defendant claims error in the giving or omission of a jury instruction, the question is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, inconsistent, or misleading. *State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006). In this case, the lack of an eyewitness instruction rendered the instructions as a whole prejudicially insufficient. Since no physical evidence was collected from the stolen truck or the tools, Petitioner was connected to the theft of the truck and tools only through Officer Tomimbang's testimony. Officer Domingo testified that he was near Officer Tomimbang when the suspect was seen driving the white truck, but Officer Domingo did not get a good look at the driver and was unable to identify him.

At trial, Officer Tomimbang identified Petitioner as the man he saw driving the truck, fleeing from the scene, and who was shortly thereafter found by the police lying in a ditch in the subdivision to which the suspect fled. The remainder of the evidence against Petitioner was extremely weak. It consisted of Officer Tomimbang's description of the suspect to the dispatch, "local male, short hair, dark clothing" or "local male, dark clothing," which would have fit any number of individuals, and of the circumstances surrounding

Petitioner's arrest. As to the latter, Petitioner's presence in the subdivision at the time of his arrest was suspicious, but, had Officer Tomimbang not identified Petitioner as the man who fled into the subdivision, the jury could have believed that Petitioner was in the wrong place at the wrong time. Ultimately, it was the testimony of Officer Tomimbang that established the crucial link between Petitioner and the man in the stolen truck. Officer Tomimbang's testimony was therefore "critical" to Respondent's case and necessitated, under the rule we adopt today, an eyewitness identification instruction.

The majority, however, would only require courts to give the instruction if the defendant requests it. *See* Majority Opinion at 315-16, 277 P.3d at 1040–41. But trial courts, not the parties, have the duty to ensure that juries are properly instructed on issues of criminal liability.[28] *Nichols,* 111 Hawai'i at 336 n. 5, 141 P.3d at 983 n. 5. There are good reasons to require an eyewitness identification instruction even in the absence of a request by a defendant. As noted in Part I of the court's opinion, juries are generally not aware of the extent to which factors such as the passage of time, witness stress, duration of exposure, etc., affect an individual's ability to make an accurate identification, and thus tend to "over believe" witness identification testimony. *See Long,* 721 P.2d at 490 (citing research); *see also Perry,* 132 S.Ct. at 732 ("'Regardless of how the initial misidentification comes about,* the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent ... courtroom identification.'") (Sotomayor, J., dissenting) (quoting *Simmons v. United States,* 390 U.S. 377, 383–384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (emphasis in original)). Statistical data demonstrate

---

relevant factors affecting eyewitness identification.

**28.** The majority asserts that the instruction at issue in this case is different from other jury instructions that this court has held trial courts are required to give *sua sponte,* because the instruction here "does not articulate a type of defense, but rather directs the jury to consider certain factors in evaluating identification testimony." Majority Opinion at 315 n. 23, 277 P.3d

at 1040 n. 23. However, mistaken identification is a type of defense and the jury instruction here is necessary to assist the jury in assessing the strength or weakness of such a defense. *See, e.g., Commonwealth v. Cuffie,* 414 Mass. 632, 609 N.E.2d 437, 438, 441 (1993) (recognizing that defendant was entitled to jury instruction when raising misidentification as a defense and modifying pattern instruction), abrogated in part by *Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116 (1997) (modifying content of instruction required by *Cuffie* ).

that jurors place undue weight on eyewitness testimony, which can greatly influence the outcome of a prosecution. *See Long,* 721 P.2d at 490 (citing research). To avoid prejudice to defendants we, along with many other jurisdictions, have abandoned the discretionary approach to trial courts' cautionary instructions in eyewitness situations. *See Perry,* 132 S.Ct. at 729 (citing other jurisdictions that have rejected a discretionary approach to instructions relating to eyewitness identification testimony). Inasmuch as courts have the ultimate responsibility to ensure juries are properly instructed, courts should give the cautionary instruction when eyewitness identification is relevant to the case regardless of whether the defendant requests it.

The majority, however, justifies the additional requirement that a defendant must ask for the instruction on the ground that defendants may wish to forgo the instruction as a matter of strategy. Majority Opinion at 315-16, 277 P.3d at 1040–41. This is one of those instances, however, in which the public interest in ensuring fair outcomes outweighs the interest of any particular defendant in obtaining a tactical advantage at trial. *See State v. Haanio,* 94 Hawai'i 405, 414, 16 P.3d 246, 255 (2001) (holding that juries must be instructed on lesser included offenses even against defendants' wishes because "[t]he judicial objectives within the context of the criminal system are to assess criminal liability and to determine the appropriate punishment" and allowing the defendant to gamble on an "all or nothing strategy" runs counter to those objectives); *State v. Davis,* 63 Haw. 191, 194, 624 P.2d 376, 378 (1981) ("The

adversary system of trial is hardly an end in itself; it is not a poker game in which [the] players enjoy an absolute right always to conceal their cards until played.").[29] Nothing undermines our criminal justice system more than the conviction of innocent defendants based on unreliable evidence. *See Perry,* 132 S.Ct. at 732 ("The empirical evidence demonstrates that eyewitness misidentification is the single greatest cause of wrongful convictions in this country.") (citation and internal quotation marks omitted) (Sotomayor, J., dissenting). To preserve the integrity of criminal trials it is therefore necessary that our courts instruct juries on how to weigh such evidence, in the same way that courts instruct juries on other fundamental matters, such as the credibility of witnesses. Here, where eyewitness testimony was at the crux of Respondent's case, the jury should have been instructed on how to assess such testimony, regardless of whether Petitioner asked for an instruction.

### B.

Once an error in the jury instructions is demonstrated, a defendant's conviction should be vacated, *"without regard to whether the defendant objected to the erroneous instruction,* if there is a reasonable possibility that the error contributed to the conviction[.]" *Nichols,* 111 Hawai'i at 337, 141 P.3d at 984 (emphasis added). Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record that the error was not prejudicial. *Nichols,* 111 Hawai'i at 334, 141 P.3d at 981.

**29.** The majority distinguishes these cases, claiming that the absence of an eyewitness jury instruction does not result in an "all or nothing" approach, *see* Majority Opinion at 315 n. 24, 277 P.3d at 1040 n. 24, and that by foregoing an eyewitness jury instruction, the parties cannot be described as "players concealing their cards until played," *id.* (internal ellipsis and brackets omitted). Respectfully, this is a narrow reading of the cases inasmuch as the fundamental principle underlying these cases is that the parties' strategies must yield to the imperative of ensuring fair and just outcomes. Eyewitness misidentification is the leading cause of wrongful convictions, *Perry,* 132 S.Ct. at 732, and any party's desire to deflect the jury's attention from identification issues is far outweighed by the need to ensure

that juries are properly instructed on eyewitness identification testimony. Furthermore, in *Haanio,* 94 Hawai'i at 414, 16 P.3d at 255 (2001), this court explained more generally that neither the defendant nor the prosecution had the right to incomplete instructions. *Id.* (citing, among others, *People v. Barton,* 12 Cal.4th 186, 47 Cal. Rptr.2d 569, 906 P.2d 531, 536 (1995) (stating that "neither the defendant nor the People have a right to incomplete instructions") (citation omitted); *State v. Feliciano,* 62 Haw. 637, 643, 618 P.2d 306, 310 (1980) ("[I]t is well settled that the trial court must correctly instruct the jury on the law.... This requirement is mandatory to insure the jury has proper guidance in its consideration of the issues before it."), superseded by statute on other grounds, HRS § 707–713).

The failure to give an instruction in this case was not harmless. The circumstances in which Officer Tomimbang's identification was made illustrate why a jury instruction was necessary. On the night in question, Officer Tomimbang was standing at the recreation center across from Ka'ahele Street when he saw a man driving a white truck down the road. It was dark and the only lighting in the area came from two street lamps, but Officer Tomimbang claimed he saw the man's face briefly as the man drove down the street. The man turned off Ka'ahele Street, parked the truck about 60 to 70 yards away from Officer Tomimbang, and began walking towards the recreation center. When the man was about twenty feet away, Officer Tomimbang shone his flashlight toward the man and ordered him to stop. Officer Tomimbang said he observed the man for a few seconds before the man fled. Officer Tomimbang's description of the suspect to the dispatch was vague—"local male, maybe short dark hair, dark clothing."

Under these circumstances, the reliability of Officer Tomimbang's identification was questionable. In view of the distance, the lighting, the short time Officer Tomimbang had to observe the suspect, and, in particular, in view of Officer Tomimbang's generic description of the suspect to the dispatch, a properly instructed jury could have concluded that Officer Tomimbang did not have an opportunity to commit the features of the suspect to memory. The centerpiece of Respondent's case against Petitioner, Officer Tomimbang's eyewitness identification, thus stood on unsure grounds.

Without a cautionary instruction, the jury was left to assess the reliability of the only testimony linking Petitioner to the charged offenses without the guidance that we today, joining many other jurisdictions, have decided is necessary, *see Perry*, 132 S.Ct. at 728 (explaining that jury instructions adopted by many jurisdictions are safeguards built into our adversary system that caution juries against placing undue weight on questionable eyewitness testimony). There is no reason to believe from the record or otherwise that

this jury knew, without an instruction from the court, the factors to consider in weighing Officer Tomimbang's testimony. It is not for us to speculate about what the jury would have done had it been properly instructed, for it is the jury's role, not that of the appellate courts, to weigh the evidence. *See State v. Kikuta*, 125 Hawai'i 78, 89, 253 P.3d 639, 650 (2011) ("[A]ssessment of the credibility of the witnesses and a weighing of the evidence [is] not within the province of an appellate court, but [is] a function of the fact finder at trial."). The failure to provide a cautionary instruction was thus not harmless.

C.

The majority disagrees on two grounds. First, the majority asserts that the jury's attention was adequately drawn to the eyewitness identification issue at trial. Majority Opinion at 317-18, 277 P.3d at 1042–43. Second, the majority contends that because the supervisory power of the court is the basis for the adoption of the eyewitness identification instruction, the instruction must be given prospectively only. Majority Opinion at 315-16, 277 P.3d at 1041–42. Respectfully, I cannot concur on either account.

1.

In my view, the jury's attention was not adequately drawn to the eyewitness identification during trial. The majority maintains that during opening argument, cross-examination, and closing arguments, Petitioner's counsel "highlighted for the jury the conditions in which Officer Tomimbang made his observations, as well as perceived weaknesses in Officer Tomimbang's testimony." Majority Opinion at 318, 277 P.3d at 1043. Thus, the majority concludes, "the factors that could have affected the reliability of the identification were pointed out by defense counsel." *Id.*

Counsel's ability to focus the jury's attention on the issue of identification, however, is the same rationale that was used in the line of cases beginning with *Padilla* to justify giving courts the discretion to decide whether to give a cautionary instruction.[30] *See,*

---

30. The majority states that whether jury instructions on eyewitness identification actually have a

positive effect on juror sensitivity has not been conclusively proven. *See* Majority Opinion at

*e.g., Padilla*, 57 Haw. at 162, 552 P.2d at 365 ("Here the cross-examination of the prosecution witnesses, the arguments to the jury, and the general instructions given by the court adequately directed the jury's attention to the identification evidence and made unnecessary the more specific instructions requested by the defendant."). This exclusive reliance on lawyer argument is precisely what today we hold to be inadequate to protect a defendant's right to a fair trial.[31] Further, we do not rely on counsel to instruct the jury. *Kassebeer*, 118 Hawai'i at 510, 193 P.3d at 426 ("'Arguments by counsel are likely to be viewed as statements of advocacy," as opposed to "a definitive and binding statement of law[.]" (quoting *Nichols*, 111 Hawai'i at 340 n. 8, 141 P.3d at 987 n. 8)). It is inconsistent on the one hand to hold that from now on the court must provide a cautionary instruction upon the defendant's request because lawyer argument is insufficient to alert the jury to the factors it ought to weigh in considering the reliability of eyewitness testimony, but on the other to hold that the argument of Petitioner's counsel was sufficient in *this* case to be assured that the jury was informed of all of the relevant factors.

The same is true of the majority's contention that the general witness credibility instruction adequately drew the jury's attention to the identification issue. Majority Opinion at 1043. The reasoning that under-

lies our holding is that the general witness credibility instruction is not sufficient to apprise the jury when it comes to considering eyewitness testimony; a more specific instruction is needed to assist juries in order to safeguard a fair trial. As is apparent from the discussion, *supra*, credibility is different from reliability. A witness may wholeheartedly believe that he or she has identified the defendant, but may nevertheless be wrong. By highlighting credibility and nothing else, the jury may have been misled into thinking that confidence is correlated with reliability, even though no correlation has been shown between the two. *See Long*, 721 P.2d at 490 (citing research). Further, with respect to reliability, the credibility instruction given here only directed the jury to consider "the witness's means and opportunity of acquiring information," which are only two of the at least ten factors we now hold juries must be instructed to consider.

In addition to all of this, the general witness credibility instruction did not apprise the jury that the Respondent bore the burden of proving Petitioner's identity beyond a reasonable doubt. Although the court did instruct the jury, generally, that Petitioner was innocent "unless and until the prosecution proves the defendant guilty beyond a reasonable doubt," the court did not draw the jury's attention specifically to Respondent's

---

316 n. 25, 277 P.3d at 1041 n. 25. But the research cited by the majority only appears to allude to the *United States v. Telfaire*, 469 F.2d 552, 558–59 (1972) instruction, whereas the instruction prescribed herein is modeled after a California model instruction that contains variables that were not mentioned in *Telfaire*, such as the witness's stress and the cross-racial or ethnic nature of the identification. Further, recognizing that eyewitness identification evidence may be unreliable, the United States Supreme Court has emphasized the importance of jury instructions in ensuring that defendants have an opportunity to test the reliability of such evidence. *Perry*, 132 S.Ct. at 721 ("When no improper law enforcement activity is involved, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, *and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable*

*doubt.*") (emphasis added). As the Court stated in *Perry*, the weight of authority favors specific eyewitness jury instructions. *Id.* at 729 n. 7 (citing twenty-five other jurisdictions that use specific eyewitness instructions). Finally, in this jurisdiction, we have relied on the long established proposition that juries are presumed to follow instructions. *Klinge*, 92 Hawai'i at 592, 994 P.2d at 524 (2000) ("[J]uries are presumed to ... follow all of the trial court's instructions.") (citation omitted).

31. Although the majority purports to rely on its examination of "all aspects of the trial" in concluding that the jury's attention was "adequately focused on the relevant factors affecting eyewitness identification," *see* Majority Opinion at 318 n. 27, 277 P.3d at 1043 n. 27, respectfully, it cannot escape the premise of today's holding that a specific eyewitness instruction is necessary because cross-examination, lawyer argument, and general credibility instruction are insufficient to ensure that juries understand how to assess the reliability of eyewitness evidence.

burden of proving that Officer Tomimbang's identification of Petitioner was reliable by proof beyond a reasonable doubt. The court's instructions were therefore not complete in terms of informing the jury how to weigh the reliability of eyewitness identification testimony—the critical issue in this case.

### 2.

The majority holds that because this court is exercising its supervisory powers to require courts to give a special jury instruction on eyewitness identification, today's ruling will apply only prospectively and not to Petitioner. Majority Opinion at 316-17, 277 P.3d at 1041–42. Supervisory powers are derived from HRS § 602–4 (1993), which states that the supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses where no other remedy is expressly provided by law. *Castro v. Admin. Dir. of the Courts*, 97 Hawai'i 463, 40 P.3d 865 (2002).

Although the majority suggests that the invocation of supervisory powers results in the prospective application of a legal principle, we have, in fact, used our supervisory powers to correct errors that occurred in the particular case from which the appeal arose. Thus, for example, in *State v. Pattioay*, 78 Hawai'i 455, 469, 896 P.2d 911, 925 (1995), we invoked our supervisory powers to hold that the "evidence at issue *in the instant case,* which was obtained in violation of [a federal statute] and then proffered in criminal proceedings against the Defendants–Appellees, must be suppressed under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state." (Emphasis added.) Similarly, in *State v. Fields*, 67 Haw. 268, 273–77, 281, 686 P.2d 1379, 1385–87, 1390 (1984), this court exercised its supervisory power to vacate the Petitioner's sentence and remanded the case to the trial court where a condition of probation made the probationer subject at all

times during the period of her probation to a warrantless search. *See also State v. Moniz*, 69 Haw. 370, 371–74, 742 P.2d 373, 375–77 (1987) (addressing petitioners' question of whether court approval was required before committed person could seek leave from hospital even though the case was not ripe and remanding for court to determine whether authorization for leave should be approved); *State v. Estrada*, 69 Haw. 204, 227–28, 738 P.2d 812, 828 (1987) (invoking supervisory powers and holding that judge's practice of personally entering jury room to answer questions was improper). These cases show that this court can and will exercise its supervisory powers to correct errors that arise in the case before it.

Respectfully, it is unfair to craft a new rule in this case but not give Petitioner the benefit of it.[32] In my view, the better approach would be to apply the new rule to the instant case and retroactively "to those defendants who are similarly situated[,]" i.e., defendants in " 'all cases pending on direct review or not yet final' " where identification is disputed, as of the date of this decision. *State v. Garcia*, 96 Hawai'i 200, 214, 29 P.3d 919, 933 (2001) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)) (brackets, ellipsis, and emphasis omitted). For one, " 'the nature of judicial review precludes us from simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new [rules], and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.' " *Id.* at 213, 29 P.3d at 932 (quoting *State v. Kekona*, 77 Hawai'i 403, 410 n. 3, 886 P.2d 740, 748 n. 3 (1994)). Under the circumstances of this case, " 'selective application of [the] new rule[ ] violates the principle of treating similarly situated defendants the same.' " *Id.* (citation omitted). Respectfully, in the instant case, the majority has " 'simply fish[ed this] case from the stream of appellate review' " and " 'us[ed] it as a vehicle for pronouncing [a] new rule[ ],' " but then leaves

---

32. It is undisputed that this case establishes a new principle of law because it overrules our clear precedent as set forth in *Padilla*. *State v. Ikezawa*, 75 Haw. 210, 221, 857 P.2d 593, 598

(1993) (holding that new rule was established because clear precedent set forth in another opinion had been overruled).

**324**

Petitioner, the one whose efforts resulted in the creation of the new rule, and the " 'stream of similar cases ... to flow by unaffected by that new rule.' " [33] *Id.* Accordingly, I cannot agree with the majority's refusal to apply the rule in this case and to

those defendants similarly situated as Petitioner.

---

**33.** The majority disagrees relying on *Haanio*, 94 Hawai'i 405, 16 P.3d 246, and *Garcia*, 96 Hawai'i 200, 29 P.3d 919, but, respectfully, those cases are not of help to the majority. In *Haanio*, we held that the court must instruct the jury on lesser included offenses when there is a rational basis in the evidence for a verdict acquitting the defendant for the offense charged and convicting the defendant for the included offense. 94 Hawai'i at 413, 16 P.3d at 254. The rule before *Haanio* was that the court had discretion to instruct juries on lesser included offenses if the prosecution did not ask for an instruction and the defendant objected to it. *Id.* at 412, 16 P.3d at 253. In that case, we applied the new rule prospectively, inasmuch as the court had *already* instructed the jury that convicted the defendant on the lesser included offense. *Id.* at 415–16, 16 P.3d at 256–57. In this case, unlike in *Haanio*, Petitioner has not had the benefit of the specific eyewitness instruction, and thus *Haanio* is distinguishable.

In *Garcia*, we noted that our decision in *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), held that blood alcohol test results should be excluded in driving under the influence of intoxicating liquor (DUI) cases where the defendant was misinformed by the police of the consequences for failing to take a chemical test. 96 Hawai'i at 208, 29 P.3d at 927. We said in *Garcia* that this exclusionary rule should be applied retroactively to DUI cases pending when *Wilson* was decided. *Id. Garcia* explained that retroactive application of the *Wilson* rule would not prejudice the *Garcia* defendant and that it would be unfair to give the *Garcia* defendant the benefit of the *Wilson* rule, while denying it to similarly situated defendants. *Id.* at 214, 29 P.3d at 933. Thus, inasmuch as, in *Garcia*, this court held that a new rule benefitting the defendant should be applied retroactively, in this case too, the rule that the jury should be given a specific eyewitness identification instruction, which would benefit Petitioner, should be applied to Petitioner and retroactively to all similarly situated defendants.