**Electronically Filed
Supreme Court
SCWC-14-0000933
29-OCT-2019
09:22 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

KEITH T. MATSUMOTO, Petitioner/Defendant-Appellant.

SCWC-14-0000933

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000933; CR. NO. 12-1-0918)

OCTOBER 29, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

The defendant in this case confessed to a crime after an interrogating officer informed him, untruthfully, that he did not pass a polygraph test. Our case law has established that deliberate falsehoods extrinsic to the facts of the alleged offense, which are of a type reasonably likely to procure an

untrue statement or to influence an accused to make a confession regardless of guilt, will be regarded as coercive per se.

The trial court in this case determined that defendant's confession was voluntarily made and admitted it into evidence over defense objection. The court also ruled that the defendant during his trial testimony, when discussing the circumstances of his confession, could not mention the word "polygraph," the word "test," or that the interrogating officer gave him inaccurate test results before his confession was elicited.

In this appeal, we consider whether a deliberate falsehood regarding polygraph results impermissibly taints a confession. We also address whether the court-imposed limitations on defendant's testimony violated his constitutional rights to present a defense and to confront witnesses. Lastly, we determine the propriety of the court's instruction to the jury that defined an element of the charged offense.

Based upon our review, we conclude that the circuit court erred in its rulings on these three issues and accordingly vacate the defendant's conviction and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND AND CIRCUIT COURT PROCEEDINGS

Keith T. Matsumoto was arrested at a wrestling tournament at Farrington High School (Farrington HS) on the island of Oʻahu on June 9, 2012, based upon allegations that he committed a sexual offense during the tournament. Matsumoto was subsequently indicted in the Circuit Court of the First Circuit (circuit court) for sexual assault in the third degree in violation of Hawaiʻi Revised Statutes (HRS) § 707-732(1)(c).[1]

### A. Motion to Suppress

Matsumoto moved to suppress statements that he made during and after a polygraph examination conducted while he was in police custody on June 10, 2012, as well as any other item of evidence recovered by the Honolulu Police Department (HPD) after that date.

---

[1]     HRS § 707-732 (2009) provides as follows:

(1) A person commits the offense of sexual assault in the third degree if:

.  .  .

(c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:

(i) The person is not less than five years older than the minor; and

(ii) The person is not legally married to the minor.

3

A hearing on the motion was held at which Matsumoto, Detective (Det.) Allan Kuaana, and Det. Kim McCumsey testified about the events surrounding a series of custodial interrogations that took place following Matsumoto's arrest.[2]

Matsumoto testified that he was the State Coordinator for Wrestling for the Hawai'i High School Athletic Association, that his daughter was a wrestler, and that he had gone to Farrington HS with his daughter on June 9, 2012, to volunteer for a wrestling tournament. Matsumoto stated that at about 12:30 p.m. he was asked to step outside, where police officers placed him under arrest. He was taken to the HPD main station, he testified, where he was booked and held in custody. At approximately 8:30 p.m. that evening, Det. McCumsey removed him from his cell and took him to an interview room. Matsumoto stated that Det. McCumsey, after going over a waiver of rights form with him, proceeded to interview him about the events of that morning, told him he would have to take a polygraph test,[3] and then returned him to his cell.

---

[2] The Honorable Randal K.O. Lee presided over all circuit court proceedings referenced in this opinion.

[3] During her testimony, Det. McCumsey testified that Matsumoto had agreed to take a polygraph test on his own volition when she asked if he was willing to submit to the test.

The next morning Det. McCumsey escorted Matsumoto to a polygraph room, he testified, where she introduced him to Det. Kuaana before leaving the room.[4]  Det. Kuaana gave Matsumoto a polygraph waiver form, Matsumoto stated, that indicated Matsumoto would be provided with the results of the polygraph immediately following the conclusion of the examination.  Det. Kuaana then put electrodes on Matsumoto and hooked him up to the polygraph machine, he testified.  Det. Kuaana asked a series of questions, unrelated to the events resulting in Matsumoto's arrest, to calibrate the polygraph.  Among other things, Det. Kuaana asked Matsumoto about his divorce and told Matsumoto to say he was holding a $5 bill when he was holding a $20 bill.  Det. Kuaana then showed Matsumoto the results, Matsumoto stated, pointing out where the machine indicated Matsumoto was untruthful.

Matsumoto testified that Det. Kuaana then interviewed him regarding the events of the previous day.  Matsumoto stated

---

[4]     Matsumoto testified that while being held at the HPD main station, he was placed in a concrete cell without an adequate blanket to shield against the cold temperature, which aggravated an existing spinal injury for which he had previously had surgery.  He further stated that he had eaten very little, had not slept much, and had become dehydrated because it was difficult to drink from the fountain in his cell, which caused his contact lenses to dry out and scratch his cornea.  Matsumoto testified that he informed Det. Kuaana of his physical state prior to taking the polygraph examination.  Detectives McCumsey and Kuaana testified that Matsumoto appeared well-rested and did not seem to be in any extreme pain or discomfort.

that, upon completion of the test, Det. Kuaana removed the electrodes and told Matsumoto that he did not pass the polygraph test. Det. Kuaana never used the term "inconclusive," Matsumoto testified, and he did not show Matsumoto the test results.

According to Matsumoto, Det. Kuaana continued to interrogate him and refused to accept his answers, stating that "there had to have been more on the basis that [Matsumoto] had failed the polygraph [test]." Matsumoto testified that Det. Kuaana told him that he needed to make another statement, and then told Det. McCumsey upon her return that Matsumoto wished to speak with her.

Following the conclusion of Matsumoto's testimony, Det. McCumsey testified. Det. McCumsey stated that she initially asked Matsumoto if he would be willing to take a polygraph test because she offers every suspect who denies committing a crime the opportunity to take an examination. She testified that she believed Det. Kuaana told her that the results of Matsumoto's polygraph test were inconclusive when she returned to the polygraph room after the test had concluded. Det. McCumsey stated that, following the polygraph examination, she brought Matsumoto to an interview room, obtained a waiver of his Miranda rights, and interrogated him a second time.

Det. Kuaana testified that there are three phases to a polygraph examination: the pre-test, the in-test, and the post-test--the last of which includes further interrogation "if someone doesn't pass an exam or fails an exam." Before giving Matsumoto constitutional warnings, Det. Kuaana stated, he explained the three phases to Matsumoto and said that he would give him the results of the examination during the post-test phase. He did not tell Matsumoto that the post-test phase could include further interrogation.

Det. Kuaana testified that during the pre-test phase he discussed with Matsumoto the difference between truth and lies, the test questions, and the allegations against him. The detective stated that, during this phase, he interacted with Matsumoto as though he believed Matsumoto was innocent and that it was his job to assist him in getting through the process. Det. Kuaana testified that he also explained to Matsumoto during the pre-test phase how a polygraph works, informing him that it "is a pass/fail test, either you pass or you don't."

After conducting a practice test, Det. Kuaana testified, he moved on to the in-test phase. He testified that he asked Matsumoto a series of questions regarding the allegations against him and determined that the results of the polygraph test were "inconclusive," meaning that Matsumoto's

"score" was "right in the middle" and did not fall within the range needed to pass or to fail the examination. Det. Kuaana testified that he nonetheless told Matsumoto that he "did not pass the test." He did not tell Matsumoto that the test was inconclusive, but he testified that he believed his statement was accurate because "for the sake of the polygraph, an inconclusive result is not passing."

Det. Kuaana stated that he then moved to the post-test phase, in which he began to ask accusatory questions and told Matsumoto that he knew Matsumoto was not telling him the truth. He explained that he intentionally shifted his attitude during this post-test phase as "an interrogation tactic":

> When I go into the post-test phase, obviously I have results from my polygraph; he didn't pass. I know there's some other things about the case, so then it becomes more accusatory. I become more confident in my accusations. It's no longer about whether or not you've done it; we know you did it. It's just a question of why did you do it.

Det. Kuaana testified that throughout the polygraph test, Matsumoto appeared to be in "disbelief" and was calm in a way that indicated that Matsumoto could not believe he was in the position that he was in. The State rested following the conclusion of Det. Kuaana's testimony.[5]

---

[5] Det. Kuaana's Polygraph Examination Report was accepted into evidence at the hearing. In the post-test section of the report, Det. Kuaana wrote that he "explained the importance to tell the truth so that whenever a

(continued . . .)

Matsumoto argued that because the results of a polygraph test are inadmissible at trial under Hawai'i caselaw, he would be unable to explain the basis and context of the statements he made during the in-test and post-test phases of the polygraph examination, and accordingly these statements should be inadmissible. Matsumoto also argued that his statements during the post-test phase should be suppressed because they were the result of Det. Kuaana intentionally leading him to falsely believe that he had failed the polygraph examination, which is an issue extrinsic to the facts of the case, and his statements were thus per se coerced and inadmissible under Hawai'i law.[6]

In response, the State argued that, although results of a polygraph test are inadmissible, the omission of the circumstances surrounding Matsumoto's statements should not render the statements inadmissible because they were supported by valid waivers of Matsumoto's constitutional rights.

---

(. . . continued)

'reasonable person' were to review the facts of the case, that person would be able to understand the subject account of the incident."

    [6]    Matsumoto also contended that Det. Kuaana's cautionary advisory to him of what a "reasonable person" would be able to understand from the facts of the case, in addition to other circumstances that Matsumoto asserted amounted to a promise of leniency, resulted in his statements not having been knowingly, intelligently, and voluntarily given.

Matsumoto's statements, the State contended, were not obtained through coercion or trickery. According to the State, Det. Kuaana did not lie when he told Matsumoto that he did not pass the polygraph examination because the results were inconclusive and did not indicate that Matsumoto had passed.[7]

The circuit court orally denied the motion to suppress at the conclusion of the hearing and later issued findings of fact and conclusions of law. The court concluded that, while the results of the polygraph examination were inadmissible at trial, the post-polygraph interview was distinguishable from the polygraph test results, and the statements made during the post-polygraph interview were therefore admissible. The court further found that Det. Kuaana's statement that Matsumoto did not pass the polygraph test was not a falsehood because it was technically true that Matsumoto did not obtain a passing result. And, even assuming the statement could be considered to be deceptive, the court continued, it would not be a falsehood extrinsic to the facts of the alleged offense that would be reasonably likely to procure an untrue statement. Matsumoto

---

[7] The State also contended that Det. Kuaana's advice that it would be better for Matsumoto to tell the truth was not deceptive or coercive and was calculated to enhance the trustworthiness of any subsequent statement by Matsumoto. The State thus argued that Matsumoto's waiver of his constitutional rights was knowing, intelligent, and voluntary.

"could have insisted that the test was wrong and that he had been telling the truth," the court stated. The court thus ruled all of Matsumoto's statements were admissible.[8]

## B. Prohibition Against Mentioning Polygraph at Trial

Prior to trial, Matsumoto filed a motion in limine regarding the statements he made following the polygraph examination. At the hearing, Matsumoto again argued that Det. Kuaana's statement to him that he did not pass the polygraph test was a "material misrepresentation." Matsumoto argued that the fact that he took a polygraph examination should be admissible, as should the fact that he was told that he did not pass. Otherwise, Matsumoto argued, the jury would not know the context in which the statements were made, including that his statements were motivated by his false belief that he had failed the polygraph examination.

The circuit court ruled that there was to be no mention of the word "polygraph" or the word "test." The court further ruled that Det. Kuaana would only be allowed to testify that he made a statement to Matsumoto that was not "totally

---

[8]     The court did not independently address Det. Kuaana's advice to Matsumoto that it was important to tell the truth so that a reasonable person could follow his account or Matsumoto's testimony that Det. Kuaana's promised him leniency if he confessed, but it ruled that Matsumoto's statements were intelligently, knowingly, and voluntarily made without police coercion.

true."  The parties were also not permitted to say to the jury that the statement was a material misrepresentation, the court held.

### C.  Trial

Trial commenced on January 17, 2014, and included the following testimony.  The complaining witness (CW) testified that, on the day of the tournament at Farrington HS, Matsumoto touched her two times in ways that made her feel uncomfortable.[9] The first time occurred when she was getting pre-match paperwork.  Matsumoto bumped into her and his hand slid across her buttocks, she stated.  The CW testified that there were many people in the area and she believed at the time that it was an accident.

The second time took place while the CW was coaching one of her friends, she stated.  The CW testified that she remembered Matsumoto walking up behind her and talking to her "about wrestling stuff" as he massaged her shoulders and touched her stomach.  When the CW tried to leave, she testified, Matsumoto slapped and grabbed her buttocks with both hands.  The CW said that, after Matsumoto touched her this second time, she went straight to her father to tell him what happened because

---

[9]     The CW described these incidents as a touch, a slap, a slide, or a grab of her buttocks.

she felt uncomfortable. The CW testified that the touch was not to congratulate her for anything.

William Ullom, who was a volunteer wrestling coach at Radford High School and was familiar with the complainant through his experience in the wrestling community, testified for the State.[10] Ullom stated that he saw Matsumoto "inappropriately touch[]" the CW by grabbing her buttocks and moving his hands to her groin and down the sides of her back. The CW reacted by getting up immediately, acting distraught, and leaving, Ullom testified. According to Ullom, as part of his mandatory reporting obligations as a coach, he insisted the police be called.

Det. Kuaana testified that his post-polygraph interrogation of Matsumoto lasted three and a half hours.[11] During the first part of his interrogation, Det. Kuaana testified that he attempted to develop a rapport with Matsumoto to get him to relax and communicate, and that he then asked

_____

[10] Ullom was also familiar with Matsumoto from two interactions at previous wrestling tournaments. In the first incident, a student wrestler did not have a doctor's note allowing him to participate in a match; Ullom attempted to have a tournament doctor clear the student to participate, but Matsumoto opposed this effort as it was against the tournament rules. In the second incident, one of Ullom's students was initially prevented from participating for failure to weigh in but was eventually allowed to compete.

[11] The interrogation was not recorded, but Det. Kuaana testified that he took notes of what was said.

Matsumoto for the facts of the case as Matsumoto understood them to be.  Matsumoto stated that he did not touch the CW's butt in any way.

Det. Kuaana testified that he then switched to a "direct confrontation technique" in which he "exud[ed] confidence" in the fact that the person he was interrogating committed an offense.  Det. Kuaana acknowledged that during the interrogation he provided some information to Matsumoto that was "not completely accurate" but explained that interrogators are permitted to use deception within guidelines set by case precedent.  Det. Kuaana indicated that his goal was to get Matsumoto to admit that he had grabbed the CW's buttocks, if Matsumoto had done so.  Det. Kuaana testified that, although he knew there were inconsistencies in the police reports, he told Matsumoto that he had solid evidence and that based on what he had seen and what he knew, there was no doubt that the allegations against him were true.[12]

Det. Kuaana then showed Matsumoto a diagram of the gym, and he pointed out where Matsumoto was when the touching

_____

[12]    Det. Kuaana also used an "alternative question" technique in which he said to Matsumoto: "Okay, look you know, there's no doubt that you touched her, but what I want to know is did you touch her just one time or more than once?"  According to Det. Kuaana, that question had "three possible answers: more than once, just once, or never."  Det. Kuaana testified that Matsumoto answered that he had only touched the CW once and was dejected after saying so.

occurred.  Matsumoto said that the CW was crouched down and he had patted and grabbed her buttocks.

Det. McCumsey testified that she observed and listened to Det. Kuaana's post-polygraph interrogation of Matsumoto through a viewing window.  According to Det. McCumsey, by the end of Det. Kuaana's interrogation, Matsumoto admitted to "grabbing" the CW's buttocks while she was bent over by the wrestling mat watching one of her friends.  Det. McCumsey stated that, following Det. Kuaana's interrogation and with Matsumoto present, Det. Kuaana told her what Matsumoto said in the interrogation as if she had not heard it before.  Det. McCumsey testified that Matsumoto agreed to submit to a second interrogation by her.[13]

During Det. McCumsey's testimony concerning her interrogations of Matsumoto, two video recordings of those interrogations were played for the jury.[14]  In the second

---

[13]    The substance of these recordings was consistent with Det. McCumsey's testimony at trial.

[14]    These videos had been edited to remove matters the court had ruled were inadmissible.  Before the recording of the first interrogation was played, Matsumoto objected to giving the jury redacted transcripts of these videos.  The deleted text was replaced by large black lines varying in size from several lines, with some lines covering nearly a full page.  Matsumoto argued that the large number of redactions were prejudicial because the jury would speculate as to the substance of the redacted words, and he requested that the jurors just watch the videos and not be provided with the transcripts.  The court overruled Matsumoto's objection, allowed the jury to use the redacted transcripts, and instructed the jurors not to speculate regarding the redacted content.

interrogation, Det. McCumsey testified, Matsumoto made statements about not remembering how any touching could have happened but said that he must have touched the CW. Det. McCumsey stated that when she tried to "lock [Matsumoto] in" to get him to "commit to something[,]" regarding touching the CW, Matsumoto responded, "I'm not gonna say I didn't. But if anything, I would characterize it as a 'good job' slap." After Matsumoto later said that it might have been a "'good job' pat on the butt," Det. McCumsey stated, she asked if the reason that Matsumoto touched the CW that way was because it was a moment of "bad judgment," and Matsumoto said it was "weakness." Det. McCumsey testified that Matsumoto also agreed that he grabbed the CW's buttocks "because the opportunity was there." In the interrogation, according to Det. McCumsey, Matsumoto demonstrated a slapping-type motion, not a grabbing motion.

Following the State's last witness, Matsumoto made a motion for a judgment of acquittal. The court denied the motion and Matsumoto proceeded with his case.

Darren Reyes, head coach for the Farrington HS wrestling team, was the site director and host for the tournament where the alleged incident took place. During the tournament, Reyes coached the CW on a wrestling move. He testified that the CW never told him that she had been

inappropriately touched by Matsumoto and that she appeared "jolly" and "cheerful" subsequent to the match when the alleged touching occurred.

Corey Taniguchi, a volunteer coach at the wrestling tournament, testified that he was standing near the CW during the second alleged touching. He testified that he saw nothing unusual during the match. R.G., a student from Waipahu High School, refereed the match when the second alleged incident occurred. He testified that he did not see Matsumoto touch the CW at any time.

Matsumoto testified on his own behalf. He indicated that he was the technical director for the Hawai'i Technology Development Venture, a federal program that develops the technology industry in Hawai'i. Matsumoto stated that he wrestled in high school and in college and had been coaching since 1979.[15] At the time of the tournament, Matsumoto said that he was a certified USA wrestling coach and was involved in

---

[15] Matsumoto also testified to previous incidents with Ullom, which Matsumoto portrayed as negative. Matsumoto stated that he blocked Ullom's student from participating in a tournament for failing to have a doctor's note. According to Matsumoto, Ullom reacted poorly to this decision. Additionally, Matsumoto testified that, at a separate tournament, he was required to block a student from wrestling for failing to weigh in. He was forced to ask Ullom to leave the coach's table, Matsumoto related, due to Ullom's disruptive reaction to his decision.

running wrestling tournaments and managing the state wrestling weight monitoring program.

Matsumoto testified that he arrived at the tournament around 10:30 a.m. He explained that one of his two daughters was a wrestler at the tournament. According to Matsumoto, the first time he saw the CW was at the scoring table; she was standing next to one of Matsumoto's daughters and other female wrestlers. Matsumoto stated that he just said "hi" to the CW but did not want to bother her because she was "running the clock" for a match.

Matsumoto testified that, during the first alleged touching, he was focused on coaching, did not interact with the CW, and did not have any physical contact with the CW. Regarding the second alleged incident, Matsumoto admitted making contact with CW's buttocks but stated that it was a "good job pat on the butt and not a grab as alleged."

According to Matsumoto, Det. Kuaana suggested that, if he gave the police something, apologized, and quit coaching, the case might not proceed.[16] Based upon Det. Kuaana telling him about the strength of the case and providing him with

_____

[16] Matsumoto also testified that Det. Kuaana told him that if he did not tell the police what he did, he would spend another night in the cell block, but that if he admitted something, they could try "to work something out."

18

"misleading or inaccurate information," Matsumoto testified, he began to doubt his memory. Matsumoto stated that he never told Det. Kuaana that he grabbed the CW's buttocks, but acknowledged that it was possible that he may have touched the CW. Matsumoto testified that he found out later that Det. Kuaana gave him information that was not completely accurate and that there was "no doubt" that the information was not completely accurate.

During the third interrogation, Matsumoto testified, he told Det. McCumsey that he could not recall touching the CW's butt but gave various examples of how it could have occurred.

### 1. Jury Instructions and Verdict

During the settlement of the jury instructions, the circuit court considered its proposed supplemental jury instruction 2 to define "sexual contact"[17]:

> "Sexual contact" means any touching, other than acts of "sexual penetration," of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.
>
> "Sexual parts" means the sex organs.
>
> "Intimate parts" means the buttocks and those parts of the body typically associated with sexual relations.
>
> In considering whether the part of the body touched is a "sexual or other intimate part," you must consider the context in which the touching occurred.

_____

[17] Sexual assault in the third degree, HRS § 707-732(1)(c), requires proof of sexual contact. See supra note 1.

(Emphases added.)

Matsumoto argued that case law had limited consideration of "context" to the circumstances underlying the incident at issue and that context must exclude subsequent conduct in a different setting.  Accordingly, he proposed his own instruction as to the applicable law.[18] Matsumoto contended that it was "critical for the jury to understand that not <u>any</u> touching of the buttocks is automatically sexual contact" as the instruction indicated.

The court during the conference with counsel provided the parties with a modified supplemental jury instruction 2, which proposed substituting a single word.[19] Matsumoto also objected to this instruction, maintaining that he still requested his proposed instruction 3 because it more accurately reflected the statement in <u>State v.</u>

_____

[18]     Matsumoto's proposed instruction 3 reads as follows:

In determining whether an alleged touching of [the CW's] "sexual or other intimate parts" occurred, you must consider the context in which the alleged touching occurred.  A body part which might be a "sexual or other intimate part" in one context might not be in another context. "Sexual parts" refers to the sex organs.  "Intimate parts" refers to those parts of the body typically associated with sexual relations. The "context" refers only to the particular situation in which the alleged touching occurred.  In evaluating the "context" in which the alleged touching occurred, you must only consider the circumstances of the particular incident, not the circumstances that occurred in prior or subsequent incidents.

[19]     The court modified supplemental instruction 2 to replace the word "touching" in the last paragraph with "contact."

Silver, 125 Hawai'i 1, 249 P.3d 1141 (2011), that "a body part which might be a sexual or other intimate part in one context might not be in another."  The court refused Matsumoto's proposed instruction 3 and submitted, over defense objection, its supplemental jury instructions 2 to the jury.

The jury found Matsumoto guilty as charged.  Matsumoto was sentenced to five years of probation, which included a jail term of six months as a condition.  Matsumoto appealed from the judgment of conviction and probation sentence to the Intermediate Court of Appeals (ICA).

## II. ICA PROCEEDINGS

The ICA in its summary disposition order (SDO),[20] first addressed the voluntariness of Matsumoto's statements.  The ICA held that Det. Kuaana's statement that Matsumoto did not pass the polygraph test was not a deliberate falsehood because "strictly speaking" Matsumoto "did not score well enough to 'pass' nor did he score well enough to fail."  The ICA also concluded that the challenged statements of Det. Kuaana regarding the polygraph test results were intrinsic to the

---

[20]     The ICA's SDO can be found at State v. Matsumoto, No. CAAP-14-0000933, 2017 WL 3720456 (Aug. 29, 2017).

charge because they related to the strength of the evidence against Matsumoto and thus were not coercive per se.

Next, the ICA analyzed the totality of the circumstances surrounding Matsumoto's post-polygraph statements and held that Matsumoto's post-polygraph statements were voluntary. The ICA determined that it was "far from clear that hearing he did not pass the polygraph exam caused Matsumoto to make his post-polygraph statements." In addition, the ICA pointed to the detectives' descriptions of Matsumoto as not appearing physically impaired and Matsumoto's level of education as supporting the determination of Matsumoto's post-polygraph statement as voluntary.[21]

The ICA then addressed the circuit court's exclusion of evidence that Matsumoto's post-polygraph statements were induced by Det. Kuaana's representation that Matsumoto did not pass the polygraph test. The ICA concluded that "Hawaiʻi case law does not provide for an exception to the prohibition against polygraph results," and Det. Kuaana's assessment of the polygraph results and his statements to Matsumoto were therefore properly excluded.

---

[21] The ICA did not address Matsumoto's argument that his confession was induced by Det. Kuaana's implied promise of leniency.

As to the court's instruction on "intimate parts," the ICA concluded that the jury instructions adequately conveyed the need to consider the context in which a body part was touched as required by State v. Silver. Matsumoto's argument, the ICA stated, "hinges on the supposition that the jury followed the ["intimate parts" of the instruction] but ignored the ["context part of the instruction"] and fails to provide any evidence in support of this assumption." Without such evidence, the ICA held that Matsumoto could not overcome the presumption that a jury generally follows court instructions and did so in this case.

Lastly, as to the sufficiency of the evidence, the ICA noted that both the CW and Ullom "testified that the touching was more than a swat on the buttocks but consisted of squeezing and moving his hands to the front of [the CW's] body." Viewing the testimony of the CW and Ullom in the strongest light for the prosecution, the ICA held that there was substantial evidence such that a reasonable juror could have found Matsumoto guilty.[22]

The ICA thus affirmed the circuit court's judgment of conviction and probation sentence. Matsumoto timely filed an application for writ of certiorari, which this court accepted.

---

[22] The ICA also rejected Matsumoto's argument regarding the prejudicial presentation of the redacted transcripts.

## III. STANDARDS OF REVIEW

### A. Conclusions of Law

Conclusions of law are reviewed de novo, under the right/wrong standard of review. Maria v. Freitas, 73 Haw. 266, 270, 832 P.2d 259, 262 (1992).

### B. Voluntariness of a Statement

The admissibility of a confession or an inculpatory statement, that is "whether the confession or inculpatory statement was voluntarily given," is a "purely legal question" decided by the trial court by "assess[ing] the manner in which a confession or inculpatory statement [was] extracted." State v. Kelekolio, 74 Haw. 479, 518, 849 P.2d 58, 76 (1993).

### C. Jury Instructions

The propriety of jury instructions is a question of law reviewed de novo using the following standard: whether, "when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Bovee, 139 Hawai'i 530, 537, 394 P.3d 760, 767 (2017) (quoting State v. Frisbee, 114 Hawai'i 76, 79, 156 P.3d 1182, 1185 (2007)).

### D. Sufficiency of Evidence

A jury verdict must be upheld if there is substantial evidence to support the conclusion of the trier of fact.

"'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution" to reach a conclusion.  State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992).  Such evidence is viewed in the light most favorable to the prosecution.  Id.

## IV. DISCUSSION

### A. Voluntariness of Statements

"The constitutional right against self-incrimination prevents the prosecution's use of a defendant's extrajudicial admissions of guilt where such admissions are the product of coercion."  State v. Kelekolio, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citing State v. Wakinekona, 53 Haw. 574, 576, 499 P.2d 678, 680 (1972)).  The reasons for barring coerced admissions include "the inherent untrustworthiness of involuntary confessions, a desire that criminal proceedings be accusatorial rather than inquisitorial[,] and a desire that the police not become law breakers in the process of achieving society's valid law enforcement objectives."  Id.  (citing Wakinekona, 53 Haw. at 576, 499 P.2d at 680).

A police officer's use of subterfuge to induce a suspect to make an incriminating statement may rise to the level of coercion, rendering the statement involuntary, untrustworthy,

25

and inadmissible. See id. at 508-09, 849 P.2d 72. When measuring "the legitimacy of the use of 'deception' by the police in eliciting confessions or inculpatory statements from suspects and arrestees," Hawaiʻi courts evaluate the use of falsehoods regarding information intrinsic to the case differently from deception that is extrinsic to the facts of the alleged offense. Id. at 511, 849 P.2d at 73. When the police use "deliberate falsehoods extrinsic to the facts of the alleged offense, which are of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt, [they] will be regarded as coercive per se." Id. (emphasis omitted).

Examples of extrinsic falsehoods include assurances of divine salvation upon confession; promises of mental health treatment in exchange for a confession; assurances of treatment in a "nice hospital" in lieu of incarceration, in exchange for a confession; promises of more favorable treatment in the event of a confession; and misrepresentations of legal principles, such as misrepresenting the consequences of a "habitual offender" conviction and holding out that the defendant's confession cannot be used against the defendant at trial. Id. at 512-13, 849 P.2d at 73-74.

When the police use "deliberate falsehoods <u>intrinsic</u> to the facts of the alleged offense in question[, they] will be treated as one of the totality of circumstances surrounding the confession or statement to be considered in assessing its voluntariness." <u>Id.</u> at 511, 849 P.2d at 73. Intrinsic falsehoods include, for example, a statement that a murder victim is still alive, a claim that articles of clothing were found at a crime scene, or an assertion that cameras were recording the area of the crime.

Matsumoto argues that, because Det. Kuaana employed an extrinsic falsehood to induce him to make incriminating statements, the circuit court should have concluded that his post-polygraph interviews were the result of coercion.

### 1. Deception as to the Polygraph Results

### a. Det. Kuaana's statement to Matsumoto that he did not pass the polygraph was an objective falsehood

Matsumoto contends that Det. Kuaana telling him that he did not pass the polygraph test was a falsehood that should have led the circuit court to preclude his statements at trial. The circuit court concluded, and the ICA agreed, that telling Matsumoto that he did not pass the polygraph test was not a falsehood, and even if it were, the falsehood was intrinsic to the offense and therefore his confession was admissible.

Det. Kuaana told Matsumoto that a polygraph examination is "a pass/fail test, either you pass or you don't." This was an incorrect and misleading characterization of a polygraph test, Det. Kuaana admitted, as the results may be inconclusive. Det. Kuaana acknowledged that there was a third possible outcome by explaining that Matsumoto did not score well enough to pass, nor "well enough to fail"; Matsumoto was "right in the middle." Despite previously explaining to Matsumoto that he would receive the results of the polygraph test, Det. Kuaana never disclosed to Matsumoto that his test results were inconclusive.

Det. Kuaana's statement that Matsumoto did not pass the polygraph test, taken in conjunction with the earlier misstatement that a polygraph test could only be passed or failed, necessarily implied that Matsumoto had failed the polygraph examination, which was objectively false. Det. Kuaana then reinforced this false impression by "confident[ly]" telling Matsumoto that he was not telling the truth, which Det. Kuaana described as "an interrogation tactic" to inform Matsumoto that he had obtained objective proof from the polygraph test that Matsumoto was lying. Matsumoto would thus have logically concluded that Det. Kuaana was communicating the results that he was promised and which represented the entirety of the

information gleaned from the polygraph test. Det. Kuaana never corrected this impression by fulfilling his pledge to disclose the actual results of the polygraph examination--that the test results were inconclusive.

Taken in context, Det. Kuaana's statements to Matsumoto amounted to an objective falsehood. And, in light of Det. Kuaana's testimony that he was "allowed to use deception" within "strict guidelines" and was acting "within these guidelines" when he made the inaccurate statements to Matsumoto, they were deliberate falsehoods. Thus, Det. Kuaana used deliberate deception when interrogating Matsumoto.

**b. Det. Kuaana's deliberate falsehood was an extrinsic falsehood that was coercive per se**

As stated, a deliberate falsehood will be regarded as coercive per se if the falsehood is extrinsic to the facts of the alleged offense and is of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt. Kelekolio, 74 Haw. at 511, 849 P.2d at 73. A deception of this nature obviates the need for a "totality of circumstances" analysis of the voluntariness of the statement by the court in order to determine admissibility. Id.

The deliberate falsehood in this case was Det. Kuaana's statements regarding the results of Matsumoto's polygraph test. This falsehood was not a lie by the officer

about any "facts of the alleged offense."  It was not, for example, a falsehood about the existence of bystanders to the crime, of witnesses coming to the station to give a statement, or the discovery of a weapon used to commit the offense. Instead of being a lie about the facts of the offense, it was a lie about the test results of a scientific instrument that was avowed to accurately determine whether the subject of the test was telling the truth.[23]  But lying about the results of a scientific test is unequivocally not a lie about the facts of the offense, and the falsehood in this case was thus extrinsic to the facts of the alleged offense.

Additionally, to be coercive per se, the deliberate falsehood also must be of a type that is reasonably likely to induce an untrue statement or to influence an accused to make a confession regardless of guilt.  In addressing this factor, we consider the nature of the polygraph test itself and the effects of its results on the examinee.

The polygraph is a scientific instrument that purports to accurately determine whether the subject of the test is telling the truth.  See United States v. Scheffer, 523 U.S. 303, 313 (1998) ("The common form of polygraph test measures a

_____

[23]     During Matsumoto's test, the polygraph indicated that Matsumoto lied about having $20 in his hand, emphatically external to the fact.

variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion . . . about whether . . . the accused--was deceptive in answering questions."). An examinee who has not lied does not expect to be given falsified polygraph test results from the police. It is thus not surprising that the presentation of falsified results may have serious and substantial effects on a suspect. "[E]xperiments have shown that . . . counterfeit test results . . . can substantially alter subjects' . . . beliefs, perceptions of other people, behaviors toward other people, emotional states, . . . self-assessments, [and] memories for observed and experienced events." Saul M. Kassin et. al, Police-Induced Confessions: Risk Factors and Recommendations, 34 L. & Hum. Behav. 3, 17 (2010) (citing studies that have tracked the effects of counterfeit test results, along with other deceptive tactics) (internal citations omitted).

Falsified polygraph results may pressure a suspect into changing the suspect's pre-test narrative. This pressure is intensified when an officer expresses confidence that the suspect is lying and is aggressive in pushing the suspect to confess on the basis of the officer's pre-formed belief of the

suspect's guilt.[24]  Richard A. Leo & Richard J. Ofshe, The Truth About False Confessions and Advocacy Scholarship, 37 Crim. L. Bull. 293, 293-370 (2001).  Falsified polygraph results are geared towards making the suspect believe in one's own guilt or believing that the officer will not stop the interrogation until the suspect confesses guilt.  See Klara Stephens, Misconduct and Bad Practices in False Confessions: Interrogations in the Context of Exonerations, 11 Ne. U. L. Rev. 593, 596 (2019) (finding that false polygraph results are "bad practices" that produce both true and false confessions).

Once a suspect believes that a confession of guilt is inevitable, the individual is cognitively geared to accept, comply with, and even approve of that outcome.  Kassin et. al., supra, at 17, (citing Elliot Aronson, The Social Animal (1999)) (exploring how human beings cognitively respond once they view an outcome as inevitable).  That is, false polygraph results may psychologically prime an innocent suspect to make a confession.

---

[24]    Det. Kuaana described the post-polygraph phase as follows:

When I go into the post-test phase, obviously I have results from my polygraph; he didn't pass.  I know there's some other things about the case, so then it becomes more accusatory.  I become more confident in my accusations. It's no longer about whether or not you've done it; we know you did it.  It's just a question of why did you do it.

The case of "The Norfolk Four" is emblematic of how falsified polygraph results can coerce a suspect into making a confession. See Tom Wells & Richard A. Leo, The Wrong Guys (2008) (detailing the backgrounds, arrests, interrogations, and court proceedings of the Norfolk Four). The Norfolk Four were young men, each without criminal records, each enlisted in the Navy, and each trained to endure highly stressful situations. Id. These men were subjected to intense interrogations in which they were repeatedly accused of lying and fed information about the case. During their interrogations, the men each took a polygraph test and were presented with falsified polygraph test results. Only then did the men confess, in graphic detail, to a brutal "gang" rape and murder that they did not commit. Id. Shortly after their confessions, DNA evidence conclusively showed that none of these men was the donor of the semen sample recovered from the victim. Nevertheless, their cases were still prosecuted: one of the men was convicted by a jury of the murder and rape, another was convicted of rape, and two took plea agreements to avoid the death penalty.[25] Id. Subsequent to their trials, the sole perpetrator of the crimes, who was

---

[25]    One of these men, Joseph Dick, became so convinced of his guilt after the false polygraph results that he would go on to testify against the other defendants and even wrote apology letters to the family of the victim professing his guilt. Wells & Leo, supra, at 187, 244.

already in prison for sexual assault, confessed to the crime and a DNA match was obtained from him.  It took over 20 years for the Norfolk Four to be granted clemency.  Priyanka Boghani, "Norfolk Four" Pardoned 20 Years after False Confessions, PBS (Mar. 22, 2017).[26]

Extensive scientific literature and numerous documented cases have demonstrated the coercive nature of falsified polygraph test results; they can change a suspect's beliefs, pressure a suspect to confess, and even cause the suspect to believe they committed the crime when they did not. We thus conclude that providing falsified polygraph test results to a suspect as part of a custodial interrogation is an extrinsic falsehood that poses an unacceptable risk of inducing an untrue statement or influencing an accused to make a confession regardless of guilt.  See State v. Cabagbag, 127 Hawai'i 302, 277 P.3d 1027 (2012) (relying on scientific studies to require a specific jury instruction regarding factors to consider in evaluating the reliability of eyewitness identifications).  Thus, inculpatory statements elicited during a custodial interrogation from a suspect whom has previously been given falsified polygraph results in the interrogation

_____

[26]     https://www.pbs.org/wgbh/frontline/article/norfolk-four-pardoned-20-years-after-false-confessions/ [https://perma.cc/J929-N96Y].

process are coercive per se and are inadmissible at trial. Kelekolio, 74 Haw. at 511, 849 P.2d at 73.

Accordingly, based on the foregoing, the circuit court erred in determining that Det. Kuaana's falsification of the polygraph test results was not a falsehood and in admitting evidence of Matsumoto's confession.

## 2. The Admission of Matsumoto's Confession Was Not Harmless Error

Erroneously admitted evidence is evaluated under the harmless beyond a reasonable doubt standard. State v. McCroy, 104 Hawaiʻi 203, 210, 87 P.3d 275, 282 (2004). Under this standard, "[t]he relevant question . . . is whether there is a reasonable possibility that error might have contributed to [the] conviction." State v. Kim, 140 Hawaiʻi 421, 434 n.15, 402 P.3d 497, 510 n.15 (2017) (quoting State v. Han, 130 Hawaiʻi 83, 93, 306 P.3d 128, 138 (2013)). Here, Matsumoto's confession was contrary to his testimony at trial in which he denied the sexual nature of his conduct in touching the CW. The confession likely detrimentally affected Matsumoto's credibility in the minds of the jury and thus there is a reasonable possibility that this evidence may have contributed to Matsumoto's conviction. State v. Kazanas, 138 Hawaiʻi 23, 41, 375 P.3d 1261, 1279 (2016) (holding that where the case turned on the credibility of the defense's witness versus the State's, the improper admission of

a statement which harmed credibility was not harmless beyond a reasonable doubt).  Accordingly, the circuit court's error was not harmless beyond a reasonable doubt.[27]

## B. Exclusion of Evidence of the Circumstances Surrounding the Eliciting of Matsumoto's Confession[28]

The due process guarantee of the Hawai'i Constitution serves "to protect the right of an accused in a criminal case to a fundamentally fair trial," and "[c]entral to the protections of due process is the right to be accorded 'a meaningful opportunity to present a complete defense.'"[29]  State v. Tetu,

---

[27]    Matsumoto asserts that the court erroneously denied his motion for judgment of acquittal.  However, by presenting evidence after his motion was denied, Matsumoto waived any error made by the circuit court in denying the motion.  State v. Calaycay, No. SCWC-17-0000386, 2019 WL 4010192, at *6 (Haw. Aug. 26, 2019).  Accordingly, we instead review whether the State presented sufficient evidence to support the conviction.  We review the trial record to determine whether, when considered in the strongest light for the prosecution, there was substantial evidence to support the conviction.  State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992).  Here, Ullom testified that he saw Matsumoto "inappropriately touch" the CW's buttocks and the CW testified that Matsumoto grabbed her buttocks in a manner that made her uncomfortable.  This evidence is of "sufficient quality and probative value to enable a [person] of reasonable caution" to reach a conclusion as to the elements of the charged offense and to support the conviction.  Id.

[28]    Our determination that police deception as to the polygraph test results was coercive per se essentially resolves the appeal in this case.  Nonetheless, we address whether the circuit court erred in excluding Matsumoto from testifying as to the totality of the circumstances surrounding his confession to enable the jury to assess its probative weight and reliability because of the likelihood of the recurrence of this issue in future cases and in light of the ICA's resolution of this point on appeal.

[29]    Article I, sections 5 and 14 of the Hawai'i Constitution provide in relevant part the following:

> **Section 5.**  No person shall be deprived of life, liberty or property without due process of law[.]

(continued . . .)

139 Hawai'i 207, 219, 386 P.3d 844, 856 (2016); State v. Matafeo, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).  Matsumoto asserts that the failure to allow him to adduce the facts and circumstances surrounding his confession violated his rights to present a defense and to confront witnesses under the United States Constitution and the Hawai'i Constitution.

Matsumoto argues that the circuit court abused its discretion in precluding him from adducing evidence at trial that his post-polygraph statements were induced by Det. Kuaana's misrepresentation that he did not pass the polygraph test. Despite the general rule that evidence of polygraph test results or a defendant's refusal or willingness to submit to a polygraph examination is inadmissible, Matsumoto argues, there should be an exception to that prohibition "where such evidence is relevant to the credibility of a confession that is introduced by the State" based on this court's decision in State v.

---

(. . . continued)

            . . . .

        **Section 14.**  In all criminal prosecutions, the accused
        shall enjoy the right . . . to be confronted with the
        witnesses against the accused, . . . to have compulsory
        process for obtaining witnesses in the accused's favor[.]

Haw. Const. art I, §§ 5, 14.

Kelekolio, 74 Haw. 479, 505, 849 P.2d 58, 70 (1993).  In response, the State points to the "per se rule of exclusion" regarding polygraph test evidence and contends that "the potential for prejudice resulting from the jury knowing [Matsumoto] had an inconclusive result with regard to the polygraph test would far outweigh any probative value that such evidence might have in determining the voluntariness or involuntariness of his subsequently obtained statement."

In Kelekolio, this court explained the difference between determining a statement's "admissibility (i.e., whether the confession or inculpatory statement was voluntarily given)," which is a question for the court, and determining the weight and effect of the confession or inculpatory statement with regard to its credibility and reliability (i.e., its worthiness of belief)," which is a question for the jury.  See 74 Haw. at 518, 849 P.2d at 76 (emphasis omitted).  Consequently, a defendant has "the right to put before the jury, as the trier of fact, all evidence, including the facts and circumstances surrounding the making of his confession, 'relevant to weight or credibility.'"  Id. at 516, 849 P.2d at 75 (quoting Hawai'i Rules of Evidence (HRE) Rule 104(e) (1985)).

The Supreme Court in Crane v. Kentucky emphasized that credibility questions, "whether of a witness or of a confession,

are for the jury," and a defendant has a "traditional prerogative to challenge the confession's reliability during the course of the trial."[30]  476 U.S. 683, 688 (1986) (citing Jackson v. Denno, 378 U.S. 368, 386 n.13 (1964)).  Accordingly, "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess."  Id.  Specifically, "the physical and psychological environment that yielded the confession can [] be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence."  Id. at 689.  Even voluntary confessions "are not conclusive of guilt[,] [a]nd, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise . . . unworthy of belief.'"  Id. (last alteration in original) (quoting Lego v. Twomey, 404 U.S. 477, 485–86 (1972)).

The Crane court explained that "a defendant's case may stand or fall on [the defendant's] ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility."  Id.  Thus, if a defendant is "stripped of

---

[30]    Crane involved a juvenile whose confession was admitted at trial. 476 U.S. at 684-85.  At trial, the juvenile sought to introduce testimony about the environment in which he made the confession to show that the confession was unworthy of belief, but the trial court ruled the testimony inadmissible.  Id. at 685-86.

the power to describe to the jury the circumstances that prompted [the] confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did [the defendant] previously admit [] guilt?"  Id.

At the suppression hearing, Det. Kuaana and Matsumoto both testified that Det. Kuaana told Matsumoto that he "did not pass" the polygraph test.  Before the trial began, the circuit court ruled that there was to be no mention of the word "polygraph" or the word "test" and that the parties were not to say that the statement was a "material misrepresentation."  The court stated it would only allow witnesses to say that Det. Kuaana made a statement that was not "totally true."  The court did not permit Matsumoto to testify or elicit from Det. Kuaana that the not "totally true" statement was in regard to Matsumoto's polygraph test results.

At trial, within the strictures of the court's ruling, Det. Kuaana testified that he provided Matsumoto "with some information that was not completely accurate."  Matsumoto likewise testified that Det. Kuaana gave him "information that [he] later on found out was not completely accurate" and that there was "no doubt" that the information was not completely accurate.  Based, in part, on this "misleading or inaccurate

information," Matsumoto testified that he "started doubting what [he] could recall." There was no other testimony concerning what Det. Kuaana told Matsumoto regarding the polygraph test.

The jury also heard testimony from Det. McCumsey and Det. Kuaana that Matsumoto admitted to grabbing the CW's buttocks while she was watching one of the wrestling matches and heard from Det. Kuaana that Matsumoto had "change[d] his statement and admitted to" grabbing the CW's buttocks. These statements, the jury further heard, were made after Matsumoto was told something that was not "completely accurate."

Thus, the jury received the testimony of the detectives that Matsumoto admitted to grabbing the CW's buttocks while she was watching the match, and they heard testimony that Matsumoto was told something that was not "completely accurate." What the jury did not have, however, was exactly what Matsumoto was told before he made inculpatory statements: that he did not pass the polygraph test.

The jury was not able to hear from Matsumoto as to the physical and mental effect of first being attached to a machine that purports to discern lies from the truth, being subjected to the polygraph test, and then being told that he did not pass the test, essentially indicating that Matsumoto lied. There is no comparison between, on the one hand, an explanation that

Matsumoto confessed because he was told something that was not "completely accurate," and, on the other, an explanation that he confessed because he was told that he did not pass a polygraph test conducted by a police detective who specifically questioned him on the nature of his conduct.

As a result of the circuit court's ruling, Matsumoto was unable to exercise his "right to put before the jury . . . all evidence, including the facts and circumstances surrounding the making of his confession, 'relevant to weight or credibility.'" Kelekolio, 74 Haw. at 516, 849 P.2d at 75 (quoting HRE Rule 104(e) (1985)). Matsumoto was not permitted to adequately explain why he made the inculpatory statements, "the one question every rational juror needs answered." Crane, 476 U.S. at 689.[31] Without being allowed to fully explain the

_____

[31] This court has observed that, "It would appear, at least in the absence of stipulation, that the courts almost uniformly reject the results of lie detector tests when offered in evidence for the purpose of establishing the guilt or innocence of one accused of a crime, whether the accused or the prosecution seeks its introduction." State v. Chang, 46 Haw. 22, 32, 374 P.2d 5, 11 (1962), overruled on other grounds by State v. Okumura, 78 Hawai'i 383, 894 P.2d 80 (1995). The Chang court explained that, "Courts do not consider the polygraph or lie detector sufficiently perfected nor the interpretation of results in its use reliable enough to permit testimony respecting such a test to be admitted in evidence." Id. at 31, 374 P.2d at 11; accord Okumura, 78 Hawai'i at 397, 894 P.2d at 94 ("According to well-established precedent in this jurisdiction, polygraph results are not admissible at trial whether offered by the prosecution or the defense . . . .") abrogated on other grounds by State v. Cabagbag, 127 Hawai'i 302, 277 P.3d 1027 (2012); State v. Antone, 62 Haw. 346, 357, 615 P.2d 101, 109 (1980) (same).

None of these cases, however, concerned the "right to put before the jury . . . all evidence, including the facts and circumstances

(continued . . .)

circumstances surrounding his confession, the jury was unable to make an informed determination regarding the credibility, reliability, and the weight to be given to Matsumoto's inculpatory statements. Kelekolio, 74 Haw. at 518, 849 P.2d at 76. The circuit court's decision to preclude Matsumoto from adducing evidence that his post-polygraph test statements were induced by Det. Kuaana, including being told that he did not pass the polygraph test, severely compromised Matsumoto's constitutional right to a fair trial under article I, section 5 and to present a complete defense under article I, section 14 of the Hawai'i Constitution.[32] Therefore, the circuit court erred and the ICA also erred in affirming the circuit court's ruling.[33]

---

(. . . continued)

surrounding the making of his confession, 'relevant to weight or credibility.'" Kelekolio, 74 Haw. at 516, 849 P.2d at 75. Any concerns of possible prejudice to the parties may be met by a limiting instruction to the jury that the evidence as to the polygraph was admitted solely for the jurors to consider the circumstances surrounding the making of the confession in order to determine weight or credibility of the confession. See, e.g., People v. Melock, 599 N.E.2d 941, 960 (Ill. 1992); People v. Rosemond, 790 N.E.2d 416, 425 (Ill. App. Ct. 2003); State ex rel. Kemper v. Vincent, 191 S.W.3d 45, 52 (Mo. 2006); State v. Melvin, 319 A.2d 450, 460 n.2 (N.J. 1974); Crumpton v. Commonwealth, 384 S.E.2d 339, 343 (Va. Ct. App. 1989).

[32]    Several courts in other jurisdictions have considered cases involving circumstances similar to this case. Crumpton, 384 S.E.2d at 343 (holding that a jury cannot appreciate the significance of a confession unless the defendant was able to "fully explain the surrounding circumstances and reasons" that he altered his prior statement after a polygraph had been conducted); State v. Schaeffer, 457 N.W.2d 194, 196 (Minn. 1990) (holding that "if the trial court admits the confession, the trial court 'must permit the jury to hear evidence on the circumstances surrounding the making of the confession . . . for a determination of weight and credibility'" thus allowing the defense to present evidence that the defendant confessed only

(continued . . .)

43

### C. Jury Instruction

### A. "Intimate Parts" Instruction Was Flawed

"It has long been held that it is the judge's duty to ensure that all jury instructions cogently explain the law applicable to the facts in the case before it."  State v. Taylor, 130 Hawaiʻi 196, 210, 307 P.3d 1142, 1156 (2013).  "This court has repeatedly stated that 'it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner,'" so that the jurors may have a clear and correct understanding of what it is they are to decide.  Id.

(. . . continued)

after being told he failed a polygraph test); Melock, 599 N.E.2d at 956, 960 (holding that "a defendant in a criminal case has a right at trial to present evidence concerning the circumstances of his confession" and that "polygraph evidence should have been admitted for the limited purpose of determining the credibility and reliability of the confession").

[33]     Matsumoto also argues that the circuit court abused its discretion in providing the jury with obviously redacted transcripts of the video recordings of his interrogations as there is a possibility that the redactions invited speculation from the jury as to the omitted content and that there is a substantial risk that the jury would ignore the court's limiting instruction not to speculate.  While we decline to resolve the issue in light of our disposition on other issues, we note that a redacted transcript does not guarantee a defendant protection from prejudice created by the redactions.  Redacted transcripts, particularly where the redactions are as pronounced as in this case, may have the effect of drawing the jury's attention to those omitted portions and may invite speculation on the part of the jury as to the omitted content.  Because of this legitimate risk, a trial court should evaluate the nature of a transcript redaction in accordance with the general standards of HRE Rule 403's probative value test.  In this case, for example, the court may have considered whether the video recordings were easily understandable without the transcript, whether the State could have readily modified the transcript to make the redactions of the transcript less prominent or minimize any potential prejudice (as was done with the meticulously modified video recording of the interrogations), and whether the blacked out passages could have been interpreted by the jury in a manner prejudicial to the defense.

(quoting State v. Feliciano, 62 Haw. 637, 643, 618 P.2d 306, 310

(1980)); accord State v. Bovee, 139 Hawaiʻi 530, 540, 394 P.3d

760, 770 (2017).

In this case, the circuit court gave, over Matsumoto's

objection, the following instruction to the jury:

> "Sexual contact" means any touching other than acts of sexual penetration of the sexual or other intimate parts of a person not married to the actor or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.
>
> "Sexual parts" means sexual organs.
>
> "Intimate parts" means the buttocks and those parts of the body typically associated with sexual relations.
>
> In considering whether the part of the body touched is a sexual or other intimate part, you must consider the context in which the contact occurred.

(Emphasis added.) Matsumoto objected, maintaining that he was

requesting his proposed instruction because it more accurately

reflected the statement in State v. Silver that "a body part

which might be a sexual or other intimate part in one context

might not be in another." Matsumoto further argued that the

court's instruction was not specific enough, it did not fully

describe context, and it did not include the limiting language

relating to consideration of context for each individual

incident. In setting forth his objection to the court's

instruction, Matsumoto specifically incorporated his written

arguments submitted in support of his proposed instruction 3,

which emphasized that "it is critical that [the] jury understand that not any touching of the buttocks is automatically sexual contact."

### a. The instruction contained a misstatement of law

It appears that the initial error in the circuit court's instruction originates from its misapprehension of our decision in State v. Silver, 125 Hawai'i 1, 249 P.3d 1141 (2011). There, the defendant argued that there was nothing in the sexual assault statutes that suggested that the legislature considered the buttocks to be an "intimate part" within the meaning of "sexual contact" as defined in HRS § 707-700. Id. at 6, 249 P.3d at 1146. This court examined the plain language of HRS § 707-700 and concluded that the provision "does not indicate whether the legislature considered the buttocks to be a part of the body typically associated with sexual relations." Id. at 7, 249 P.3d at 1147. However, in reviewing the legislative history of section 707-700, as well as engaging in an in pari materia reading of HRS § 712-1210, we concluded that "the legislature intended the buttocks to be an 'intimate part' for purposes of 'sexual contact' as that phrase is defined in section 707-700." Id. In support of its conclusion, the Silver court cited the following statement from State v. Kalani: "This court has noted that the definitions of 'sexual contact' under HRS § 707-700 and

'sexual conduct' under HRS § 712-1210 were both 'adopted expressly for use in penal statutes <u>regulating conduct with sexual connotations</u>' and construed the two statutes with reference to one another." <u>Id.</u> (emphasis added) (quoting 108 Hawaiʻi 279, 286, 118 P.3d 1222, 1229 (2005)). Thus, the <u>Silver</u> court held that the buttocks may be an intimate part under the definition of "sexual contact" provided the conduct involving the buttocks is associated with "sexual connotations" or "sexual relations." <u>Id.</u> The <u>Silver</u> court emphasized this holding by quoting from the ICA decision in the same case, which "cautioned" that "a 'body part which might be intimate in one context, might not be in another [context].'" <u>Id.</u> (<u>citing State v. Silver</u>, 123 Hawaiʻi 299, 233 P.3d 719 (App. 2010) (unpublished table decision)). This court further quoted from the ICA decision as follows:

> with respect to the buttocks, it is not uncommon for youth team coaches to give their players a congratulatory pat on the buttocks in recognition of a good play or outstanding effort. Parents hugging or carrying a young child may also place their hands on the child's buttocks. In these situations, adults are knowingly touching the buttocks of another person who is less than fourteen years old. But because of the context, it would be unreasonable to regard the child's buttocks as an "intimate part" for purposes of applying the sexual assault statutes. <u>In these contexts, the child's buttocks would not be a body part "typically associated with sexual relations.</u>"

Id. (emphasis added) (quoting Kalani, 108 Hawai'i at 284–85, 118 P.3d at 1227–28).[34]

In this case, the circuit court instructed the jury that intimate parts means the buttocks. In doing so, the court effectively told the jury that, as a matter of law, the buttocks is an intimate part of the body. This statement is plainly contrary to our holding in Silver. The circuit court apparently relied upon statements in the Silver decision that indicate that the legislature intended the buttocks to be included within "intimate parts" as that term is used in "sexual contact."[35] See Silver, 125 Hawai'i at 7, 249 P.3d at 1147. But the fact that

_____

[34] The Silver court next considered whether there was substantial evidence to support the defendant's convictions. 125 Hawai'i at 7, 249 P.3d at 1147. With regard to the late night massages, the minor testified that, while the defendant slept next to him, the defendant woke him up at least three different times by rubbing his buttocks and whispering to him. Id. Based on such evidence, this court concluded that the defendant's conduct "constituted the touching of an 'intimate part' of Minor's body." Id. On the other hand, as to conduct in the pool that the minor described as the defendant holding "[k]ind of like my crotch to throw me or under my butt to throw me," the context of the conduct as occurring during horseplay in a pool was insufficient as a matter of law to support a conviction. Id. at 8, 249 P.3d at 1148. The key to this court's ruling was that the conduct was not demonstrated to have sexual connotations or be associated with sexual relations but, instead, involved horseplay. Id. at 8-9, 249 P.3d at 1148-49.

[35] We have repeatedly cautioned, "It is not every statement of the law found in a text-book or opinion of a judge, however well and accurately put, which can properly be embodied in an instruction." Territory v. Cutad, 37 Haw. 182, 186 (Haw. Terr. 1945) (quoting Garfield v. State, 74 Ind. 60, 63-64 (1881)); State v. Clyde, 47 Haw. 345, 357, 388 P.2d 846, 853 (1964); accord In re Estate of Herbert, 90 Hawai'i 443, 468, 979 P.2d 39, 64 (1999). This caveat is even more salient when the statement is not a statement of law but, instead, is a part of the court's reasoning leading to the court's decision.

the legislature had no intention to <u>exclude</u> the buttocks from

"intimate parts" is a completely different proposition than the

conclusive statement that "intimate parts" means the buttocks.

The circuit court's instruction therefore misstated the law

insofar as it necessarily included the buttocks within the

meaning of "[i]ntimate parts."[36]

### b. The instruction was ambiguous and incomplete

Matsumoto also argues that the circuit court's

instruction was not specific enough and did not provide the

meaning of context.

As stated, the circuit court instructed the jury as

follows:

> "Intimate parts" means the buttocks and those parts
> of the body typically associated with sexual relations.
>
> In considering whether the part of the body touched
> is a sexual or other intimate part, <u>you must consider the
> context in which the contact occurred</u>.

(Emphasis added.)

The court's instruction was deficient in that the

court failed to inform the jury that the touching of the

buttocks must be associated with sexual relations or have sexual

connotations in order for the buttocks to be an intimate part.

---

[36] The circuit court's misstatement of law that "'[i]ntimate parts' means the buttocks" was not corrected. The jury was never expressly instructed that an intimate part does <u>not</u> mean the buttocks under certain circumstances.

See Silver, 125 Hawaiʻi at 7, 249 P.3d at 1147 (concluding that for a part of the body to be considered an "intimate part" as used in HRS § 707-700, it must be associated with sexual relations); Kalani, 108 Hawaiʻi at 284-85, 118 P.3d at 1227-28 (same). Thus, the context the jury considered may have had nothing to do with whether the conduct was associated with sexual relations or sexual connotations, and the fact that the touching occurred in a high school athletic setting may have been considered as a context sufficient to render the buttocks an intimate part.[37]

Relatedly, the jury was also never instructed that a part of the body which might be sexual or intimate in one context might not be in another. This was a significant omission given the circuit court's erroneous statement that the

---

[37] Matsumoto also argues that the jury should have been instructed, pursuant to Silver, to limit its consideration of "context" to the alleged touching at the wrestling mat. In Silver, this court disagreed with the ICA's conclusion that a rational jury could infer a connection between touching in a pool and late night massages in the home. 125 Hawaiʻi at 4, 8-9, 249 P.3d at 1144, 1148-49. The defendant's subsequent conduct during the massages, we reasoned, did not turn the defendant's earlier conduct in the pool--which was "otherwise not actionable"--into a criminal offense. Id. at 8-9, 249 P.3d at 1148-49. The ICA's conclusion, this court stated, relied on "conduct that occurred at a later time, in a different setting, and which was the basis for three separate counts of sexual assault." Id. at 8, 249 P.3d at 1148.

In this case, the CW testified about two occasions when Matsumoto touched her; however, she characterized one of those occasions as "accidental." It does not appear that the State sought to infer a connection from the conduct that occurred by the wrestling mat to the conduct that the CW testified was accidental. However, on remand, the circuit court should address this aspect of context in its instructions.

buttocks is an intimate part as a matter of law. The omission had the detrimental effect of increasing the ambiguity of the instruction.

Here, the circuit court's jury instruction contained a misstatement of law and was ambiguous and incomplete. Thus, the ICA erred in concluding that Matsumoto's argument pertaining to the jury instructions was without merit.[38] On remand, the instruction on "intimate part" should cogently explain the law applicable to the facts in this case. Taylor, 130 Hawaiʻi at 210, 307 P.3d at 1156.

## V. CONCLUSION

Accordingly, the ICA's September 26, 2017 Judgment on Appeal and the circuit court's June 27, 2014 Judgment of Guilty Conviction and Probation Sentence are vacated, and this case is

---

[38] The ICA ruled that Matsumoto's argument relied on the assumption that the jury only followed the first part of the court's instruction that "'[i]ntimate parts' means the buttocks" and disregarded the second part requiring consideration of the context in which the contact occurred. The ICA held that Matsumoto failed "to provide any evidence in support of this assumption" and that the jury is presumed to follow the court's instructions.

Whether a jury instruction is flawed is not determined by whether the defendant is able "to provide any evidence in support of [an] assumption" that the jury followed a flawed portion of the instruction. Even assuming that the circuit court's instruction in its entirety was not technically flawed, "[t]he '(q)uestion on review of instructions is not whether they were technically correct but whether defendant could have suffered prejudice on their account.'" State v. Napeahi, 57 Haw. 365, 377, 556 P.2d 569, 576 (1976). Given the contradictory nature of the court's instruction, it is not possible to determine which portion of the instruction the jury followed. Additionally, the instruction was ambiguous and incomplete for the reasons discussed.

remanded to the circuit court for further proceedings consistent

with this opinion.


David M. Hayakawa                    /s/ Mark E. Recktenwald
for petitioner
                                     /s/ Paula A. Nakayama
Chad M. Kumagai
(Stephen K. Tsushima with him        /s/ Sabrina S. McKenna
on the briefs)
for respondent                       /s/ Richard W. Pollack

                                     /s/ Michael D. Wilson

